[Civ. No. 10614.   Third Dist.   Nov. 8, 1963]

ALBERT INNS et al., Plaintiffs and Respondents, v. SAN JUAN UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

John B. Heinrich, County Counsel, A. J. Guetling, Deputy County Counsel, and Fitzwilliam, Memering & McDonald for Defendant and Appellant.

Charles F. Gray Jr., and Richard L. Thurn for Plaintiffs and Respondents.

VAN DYKE, J.*—Appellant San Juan Unified School District of Sacramento County owns 30 acres of land upon which a school has been built. The southwest corner of the school property adjoins the northeast corner of respondents' property. Appellant's land is higher than respondents' land. In its natural state water drains from appellant's land to that of respondents. When the school was built appellant's land was graded, and for drainage purposes a 28-inch concrete pipe was placed below the surface of the land, in which location it gathered up water and discharged it onto respondents' land. By its judgment the trial court awarded $3,000 damages to respondents and the district appeals.

The trial court found as follows: "That in a state of nature a swale transversed defendant's property in the direction of its southwest corner which adjoins the northeast corner of plaintiffs' land. This swale formed a natural medium for the delivery of storm water to plaintiffs' land. Before defendant graded its property and erected a school in 1958 to 1959, the natural drainage from defendant's property created considerable wetness along the easterly side of plaintiffs' land. The swale however possessed inherent protective qualities. Sloping gently and with shallow sides, it had certain retentive powers. Composed of soil and vegetation, it

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

had the capacity to absorb, withhold and delay the delivery of run-off.

"That in the course of defendant's school construction project, the swale was filled, and raised the surface of the ground at the common corner by approximately seven (7) feet. Defendant also installed a twenty-eight (28) inch submerged concrete drainage pipe. The pipeline follows the general course of the former swale emerging five (5) or six (6) feet below the surface of the artificial grade or embankment created at the common corner. Within the compass of a twenty-eight (28) inch circular channel composed of nonabsorbent material, it now delivers at plaintiffs' corner the water which formerly drained through the swale.

"That water which once transversed the relatively wide contours of the said swale is now delivered within the restricted compass of a twenty-eight (28) inch pipe. Water which once moved slowly along the gently sloping absorptive surface of the swale is now channeled at increased velocity within the impervious length of a concrete pipe. Water which was once accepted and confined along a relatively low area at the easterly side of defendant's land now affects a much larger area because the relatively high volume and velocity transcend the absorptive capacity of the former line of drainage. That defendant's project has concentrated the flow of water both in time and space·

"That the natural drainage of the plaintiffs' and defendant's land descended through a swale and not a watercourse."

It is apparent from the wording of the findings which make use of such terms as "storm water," "run-off," "natural drainage," and "swale," and from references to the delaying, retentive, and absorptive qualities of the slopes of the swale, that the court is here dealing with surface water. This is fortified by the finding that the swale did not constitute a watercourse; by the proof that appellant's land boundaries roughly correspond to the whole drainage area; and by the opinion of the court which appears in the record. Said the court:

"There is little evidence of any important increase in the total quantity of water reaching plaintiffs' land over an extended period. The gravamen of plaintiffs' injury is that defendant's project has concentrated the flow of water both in time and space. Water which once traversed the relatively wide contours of the swale is now delivered within the re-

stricted compass of a 28-inch pipe. Water which once moved slowly along the gently sloping absorptive surface of the swale is now channeled at increased velocity within the impervious length of a concrete pipe. Water which was once accepted and confined along a relatively low area at the easterly side of defendant's land now affects a much larger area, because the relatively high volume and velocity transcend the absorptive capacity of the former line of drainage.

"Defendant has misconceived the character of the water and the character of the natural drainage. These misconceptions have, in turn, generated a misconception as to the governing doctrine.

"The water in this case is not flood water, not a 'common enemy' .... Prior to defendant's improvements, it did not flow in a defined stream or water course, . . . This water is surface water, rainfall which spreads over the surface of the ground without being collected into a definite body. In a state of nature it drains along a swale, hollow or depression. As the *San Gabriel* case notes ([*San Gabriel Valley Country Club* v. *County of Los Angeles*] 182 Cal. 392 at p. 398 [188 P. 554, 9 A.L.R. 1200]): 'The difference between surface waters and those collected and flowing in a watercourse is well recognized, and the same rules by no means apply to one as to the other.'

"The rule applicable to the present case is that stated in the decision cited by plaintiffs: *Wood* v. *Moulton*, 146 Cal. 317 [80 P. 92]; *Steiger* v· *City of San Diego*, 163 Cal.App.2d 110 [329 P.2d 94]; *Board of Trustees* v. *Rodley*, 38 Cal.App. 563 [177 P. 175]. An authoritative expression of the rule appears in *LeBrun* v. *Richards*, 210 Cal. 308 [291 P. 825, 72 A.L.R. 336], and it is enunciated as dictum in the *San Gabriel* case. The rule may be summarized as follows: An upper land owner has a natural easement or servitude which permits him to discharge surface water through the drainage mechanism of a natural swale, hollow or depression. His right is limited to disposition of the water through the chosen channels of nature· He cannot increase the volume or velocity by collecting the water in pipes or artificial ditches. If he does so to the damage of the lower landowner, he is liable to the latter.

"[T]he court has carefully scrutinized a topographic map which indicates both the natural contours and the complete and projected grades . . . The court is thoroughly satisfied that the natural drainage descended through a swale and not

a watercourse. . . ."

■ If the water draining from appellant's land was wholly or mostly surface water, then the rule declared in *LeBrun* v. *Richards, supra,* governs the decision herein.

■ Appellant contends that the evidence does not support the finding that the natural drainage of plaintiffs' and defendant's land descended through a swale and not a watercourse. We think the evidence does support the finding. The evidence fairly discloses the following:

It appears that the 30 acres of land owned by appellant is in an area where the land is properly described as gently rolling land. The contour map shows the greatest variation of elevation in the various parts of the land are around 20 feet, and most of these differences appear where the elevations are taken on knolls that rise from the general plain of the land. The appellant's land is roughly conformable to the natural drainage area that drains onto respondents' property. It appears that one of the purposes for the artificial drain was to concentrate and hurry the surface water off and away from appellant's property, and the evidence is ample to show that it had that effect. Before and after evidence is to the effect that very little wetness was caused to exist on respondents' property through the years before the artificial drain was installed and before planing of respondents' property occurred, whereas thereafter, almost any heavy rainfall submerged portions of respondents' land. Both parcels of land are in an area where lands are being subdivided, and there was evidence that expensive artificial drainage would have to be undertaken before respondents' land theretofor suitable for subdivision purposes would again become so. Although the evidence as to the nature of the swale which constituted the lowest portion of appellant's property was in conflict, the evidence substantially supports the finding that it was not a watercourse, but that on the contrary it was what has been designated as a swale, or draw, into which the surface water falling upon appellant's property found its way and slowly left appellant's lands and went upon that of respondents. Since the evidence does support the court's finding as to the nature of the drainage area and as to the change brought about by appellant's improvements, the rules governing the relative rights of upper and lower proprietors as to surface water must be applied as they were applied in the trial court.

■ Appellant contends that the damages were improperly assessed, saying, "It is our contention that this was an

improper assessment of damages, since there is no evidence in the record of the diminution of value to Respondents' property, or of the actual value of Plaintiffs' property at the time of the alleged injury thereto.''

The trial court found that ''the actions of defendant in constructing the aforementioned concrete pipeline with the resulting flooding of plaintiffs' property has resulted in the diminution in the value of plaintiffs' property in the sum of Three Thousand Dollars ($3,000.00).'' It is this finding which appellant attacks as being unsupported in the evidence. The evidence is not satisfactorily sharp and clear when this test of value diminution is applied. But we think the record supports the findings. Mrs. Ruth Inns, one of the owners of the property, testified that, although unsubdivided as yet, the property contained, as she put it, six lots. When asked, ''How much do you want for the property now?'' she answered, ''$3,000 a lot,'' and added that the sum was what property was selling for in that area. This amounted to an expression of an opinion, by her, and being an owner she was qualified to express an opinion, that the property was worth $18,000. But this was apparently on a subdivided basis. She further said, when the court asked her if when she talked about a lot for $1,000 she was talking about $6,000 for the parcel, ''Yes, sir.'' Mr. Inns testified that prospective buyers coming to their property were not interested in purchasing it in its present condition unless and until the drainage problem from the school had been solved. The following occurred: ''Q. Mr. Inns, Mrs. Inns testified you have your property listed for sale at the present time. Have you had any buyers interested in your property? A. Well, we have had them there, but they rejected the place on account of the pipe coming from the school. Q. When they looked at the property do [sic] you tell them about the pipe? A. I told them. Q. Did that sour them, so to speak? A. Yes, they said they weren't interested until it is fixed. Q. You have had no offers on this land since the time of the Barrett Hill Elementary School? A. No.'' While unsatisfactory, the foregoing does show a great diminution in the sale value of the land had been caused.

There was evidence that the cost of a pipe to carry the water discharged from appellant's pipe across the respondents' land and to a public drain would be, as one witness put it, between four and five thousand dollars, and as another witness put it, between two and three thousand dollars. The

trial court viewed the property and may have been of the opinion that the construction of such a pipe would remedy the situation caused by appellant's trespass and restore the value of the land to what it has been. If that be true, then the court could properly conclude that the cost of the pipe measured the diminution in value of respondents' property. We think the record sustains the court's measurement of damages and the finding made.

Finally, appellant contends that since the case was tried upon the theory that it was a proceeding in inverse condemnation, and this appears to have been the fact, appellant was entitled to an easement for the continuation of the drainage now being accomplished through its drainage system and that the judgment should have so declared. We think the judgment should have made a formal declaration to that effect, but it is unnecessary to reverse the judgment for that purpose. We can modify the judgment here to that extent, and as so modified affirm it. Appellant has an easement to discharge the surface water falling upon its property through the pipeline and onto respondents' land.

As modified the judgment is affirmed. Respondents to recover costs.

Pierce, P. J., and Schottky, J., concurred.