Filed 4/3/15  Appendix not available electronically

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT
DIVISION TWO

| | |
|---|---|
| CONTRA COSTA COUNTY,<br><br>    Cross-complainant, Cross-defendant and Respondent,<br><br>        v.<br><br>PINOLE POINT PROPERTIES, LLC,<br><br>    Cross-defendant, Cross-complainant and Appellant;<br><br>BNSF RAILWAY COMPANY,<br><br>    Cross-defendant and Respondent. | A139091<br><br>(Contra Costa County<br>Super. Ct. Nos. MSC0901011,<br>MSC1000185) |

Contra Costa County (the County) owns and operates a drainage system on Lettia Road in the Montalvin Manor residential subdivision (Montalvin Manor). This drainage system connects to a drainage channel on adjacent property owned by Pinole Point Properties, LLC (Pinole Point). When the drainage channel is functioning, its water flows into the San Pablo Bay (the Bay).

After experiencing storm-related flooding, homeowners on Lettia Road sued the County; the County cross-complained against Pinole Point for, among other things, nuisance and negligence. The County alleged that Pinole Point was responsible for the flooding by permitting the drainage channel to be blocked with debris and vegetation. Pinole Point filed a cross-complaint against the County,[1] which included claims for negligence and inverse condemnation.

The County and Pinole Point settled with the homeowners and their claims against each other proceeded to a bench trial. The court, applying the reasonableness test set

---

[1] The County's cross-complaint also named BNSF Railway Company (BNSF) as a cross-defendant.

1

forth in *Keys v. Romley* (1966) 64 Cal.2d 396 (*Keys*) and *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 (*Locklin*), found in favor of the County and against Pinole Point. The court determined that the drainage channel is a natural watercourse, that the County's conduct with respect to its property had been reasonable, and that Pinole Point's failure to maintain the drainage channel had been "entirely unreasonable" in light of its actual or constructive knowledge when purchasing the property of the existence of the drainage channel and the need to keep it clear of debris to prevent flooding to the adjacent homeowners. The court awarded damages to the County and ordered Pinole Point to clear and maintain the obstructed drainage channel.

On appeal, Pinole Point contends that it has no legal duty as the downstream property owner to maintain the drainage channel, especially since it did not create any diversion or obstruction to the flow of the water. Even if it had a duty, the County's conduct, according to Pinole Point, was unreasonable and therefore the County should be liable for all costs related to maintaining the drainage system.

As we explain, the trial court properly applied the reasonableness test and substantial evidence supported its findings. Accordingly, we affirm.

## BACKGROUND

### *The Homeowners' Lawsuit and the Parties' Pleadings*

The superior court consolidated two lawsuits by homeowners seeking damages against the County for storm-related flooding of their homes on Lettia Road in Montalvin Manor that occurred on February 17, 2009. (*Cardenas v. Contra Costa County* (Super. Ct. Contra Costa County, No. C09-01011); *Puckett v. Contra Costa County,* (Super. Ct. Contra Costa County, No. C10-00185).) The County answered and filed cross-complaints against Pinole Point, BNSF, and Union Pacific Railroad Company (Union Pacific) for indemnity and contribution, negligence, nuisance and trespass, and injunctive relief. Subsequently, the County dismissed Union Pacific and BNSF from its cross-complaint. The County sought monetary damages from Pinole Point for its costs related to pumping storm waters on Lettia Road during the period of March 1, 2009, to June 1, 2011. It also sought injunctive relief requiring Pinole Point to clear and maintain the

2

obstructed drainage channel on its downstream property and to perform temporary pumping until the channel-clearing project could be completed.

Pinole Point answered County's cross-complaint and filed its own cross-complaint against the County, BNSF, and Union Pacific for indemnity, contribution, inverse condemnation, declaratory relief, and tortious diversion of surface waters. Subsequently, Union Pacific obtained a summary judgment against Pinole Point's cross-complaint.

The homeowners settled their lawsuit for $90,000. Under the settlement terms, the County and Pinole Point agreed to contribute $45,000; both agreed each could seek recovery from the other at trial. On the first day of trial, the County stipulated that sediment it had not removed from the storm drain proximately caused the flooding of the homes on February 17, 2009. The County conceded liability for the $45,000 Pinole Point paid to the homeowners. The matter proceeded to trial on the two cross-complaints.

***The Trial, Judgment, and Notice of Appeal***

The property that is the subject of this litigation is a 26-acre undeveloped parcel, including wetlands, in Richmond, California. (A copy of the map is attached as appendix A, *post*, p. 31.) In 1979, Pinole Point acquired the low-lying parcel near the Bay from Bethlehem Steel Company (Bethlehem Steel) as part of a 500-acre block of land. Pinole Point sold off some of the larger parcels; it still owns a portion of this land, which the parties refer to as the Remainder Parcel.

Prior to the 1890s, the Remainder Parcel existed in a natural state. The property received tidal flow intrusions from the Bay to the north. It also received storm water runoff from upland areas to the south.

In the 1890s, BNSF and Union Pacific, or their predecessors, constructed high berms and railroad tracks across the property (UP berm). The UP berm extends from west to east and lies adjacent to the northern limit of the Remainder parcel. Before construction of the UP berm, storm waters reaching the Remainder Parcel flowed freely out to the Bay. The UP berm contains a single outlet that measures approximately 1.5 feet by 2.5 feet (UP culvert). The UP culvert extends through the UP berm near the eastern side of the Remainder Parcel.

3

Additionally, in the late 1800s, immediately upslope and adjacent to the southern limit of the Remainder Parcel, a second elevated earthen railroad berm (BNSF berm) was built. The BNSF berm extended from west to east across the full width of the southern limit of the Remainder Parcel, lying between the Remainder Parcel and what would later become Montalvin Manor. At least one 24-inch cast iron drainage pipe was installed through the BNSF berm upstream (the 24-inch Pipe) on the eastern edge of the Remainder Parcel.

The UP and BNSF berms prevented the natural flow of drainage waters into the Bay. The BNSF berm trapped water to the south of the BNSF tracks on what would later become the Lettia Road area in Montalvin Manor. The UP berm trapped water between the tracks on the Remainder Parcel.

Aerial photographs of the Remainder Parcel taken in the late 1940s, prior to the construction of Montalvin Manor, revealed that the drainage pipes constructed by the railroads were not working very well. The 1947 aerial photograph confirmed that water was being trapped in the lowlands south of the BNSF tracks in the area that would become Lettia Road. Additionally, the Remainder Parcel between the two tracks had become a water detention basin that held water drained through the BNSF berm until it eventually drained into the Bay through the drainage pipe in the UP berm. The aerial photographs also indicated that there were no defined drainage channels at the easterly side of the Remainder Parcel between the 24-inch Pipe (upstream) and the UP culvert (downstream).

In the 1950s, Montalvin Manor was constructed. Pinole Point's civil engineering expert, Michael Milani, testified that the housing development built in the early 1950s significantly increased the volume of water, flow rate of water, and velocity of water discharged into the Remainder Parcel.

The trial court found that the original drainage scheme of Montalvin Manor tied into the preexisting 24-inch Pipe installed on the eastern edge of the low portion of the Remainder Parcel. The court also found that by 1957 a drainage channel (the Drainage Channel) was constructed on the Remainder Parcel and it directly conveyed water from

4

the 24-inch Pipe in the BNSF berm to the culvert in the UP berm. In the 1960s and 1970s, the Drainage Channel was 14 to 16 feet wide and 6 to 8 feet deep. Storm waters from Montalvin Manor also discharged through a 36-inch concrete storm drain (36-inch Pipe) located west of the 24-inch Pipe. Water from the 36-inch Pipe did not empty into the Drainage Channel, but collected in a large marshy area to the west of the 36-inch Pipe.

The Drainage Channel was kept clear of vegetation and debris from the time of its construction until Pinole Point took title to the Remainder Parcel. Although no conclusive evidence showed who maintained the Drainage Channel, there was evidence that Bethlehem Steel, the prior owner of the Remainder Parcel, had cleaned out the Drainage Channel on at least one occasion in 1970. The trial court concluded that Bethlehem Steel had probably kept the Drainage Channel clear while it owned the Remainder Parcel.

At the time Pinole Point purchased the large piece of property from Bethlehem Steel in 1979, the Drainage Channel running across the Remainder Parcel was functional, open, and obvious. The trial court found that Pinole Point knew or should have known about the Drainage Channel and the intermittent maintenance it required to remain functional.

The County owned or controlled Lettia Road. In 1981, it approved a project to address flooding along Lettia Road in Montalvin Manor. The County installed a 54-inch diameter storm drain pipe (54-inch Pipe) on Lettia Road that extended northward a distance of approximately 190 feet from Lettia Road through the BNSF berm near the 24-inch Pipe to replace the existing 24-inch Pipe and 36-inch Pipe. The 54-inch Pipe was located at approximately the same location as the 24-inch Pipe, and discharged water into the Drainage Chanel. This project was approved over Pinole Point's objections, and construction was completed in 1982. The trial court determined that this construction did not increase the amount of water discharged onto the Remainder Parcel from Montalvin Manor but simply redirected some of the water already discharging onto the Remainder parcel from the 36-inch Pipe. The trial court found that the 54-inch Pipe might have

5

increased the rate of silt deposits in the Drainage Channel due to the increase in runoff flow at that location, but the same amount of silt would have been deposited through the drainage facilities that were in place prior to 1982.

Pinole Point did not maintain the Drainage Channel and over time it became obstructed with large trees, bushes, debris, and sediment. In 1991, Gregory Marshal Connaughton, a supervising civil engineer with the County, sent a letter notifying Pinole Point that the Drainage Channel was "obstructed with silt and vegetation" and "as a result, water ponds in Montalvin Manor." He requested that it re-excavate the channel and warned that, without the appropriate action, Lettia Road would flood. He also wrote to Pinole Point on November 5, 2002, warning about the accumulation of sediment and vegetation. He again warned Pinole Point about the problems on January 21, 2003, January 30, 2003, and October 24, 2007.

Following the flooding on February 17, 2009, the County sent its maintenance crews to Lettia Road to prevent flooding whenever it anticipated a significant rainstorm. During rainstorms, the crews operated portable pumps to pump water from the 54-inch Pipe junction box to the drainage inlet of the 36-inch Pipe farther west. The County submitted evidence that from March 1, 2009, through June 1, 2011, the County spent $141,090.10 on emergency flood protection efforts to prevent flooding on Lettia Road and the surrounding neighborhood.

With the consent of all counsel, Judge Steven K. Austin independently inspected the site, which included his walking the entire length of the Drainage Channel, the area of the 54-inch Pipe, and Lettia Road.

At the end of the trial, the court found the Drainage Channel to be a "natural watercourse." It concluded that the County acted reasonably by attempting to persuade Pinole Point to maintain the Drainage Channel and in implementing temporary pumping programs during storms to prevent additional flood damage. In contrast, it concluded that Pinole Point had acted "entirely unreasonable," elaborating: Pinole Point "purchased property with a long-standing, functioning Drainage Channel. At the time, it knew or should have known that the Drainage Channel existed and that it had been maintained by

6

the prior owner. It allowed the Drainage Channel to become clogged with debris, vegetation and sediment to the point that the Drainage Channel was no longer functional. It has steadfastly refused to take any action to maintain the Drainage Channel in any way. It has done so with the knowledge that its inaction has resulted in substantial damage to the County and to the homeowners along Lettia Road, and with the knowledge that its inaction will result in continued damage in the future." It ruled that Pinole Point was negligent in failing to maintain the Drainage Channel and liable in nuisance as its conduct damaged the County as the owner of Lettia Road and interfered with the free use and enjoyment of that property. It found that the flood damage was not the result of any type of physical invasion of surface waters from the Remainder Parcel and rejected the County's claim of trespass.

The trial court awarded the County $141,090.10 in damages for emergency flood protection efforts. The court also granted the County's request for an injunction. It determined that the blockages within the Drainage Channel caused the 54-inch Pipe not to function and made flooding on Lettia Road likely. The court ordered Pinole Point to clear its Drainage Channel of the obstructions and to provide temporary pumping services until it completed the required work. The court denied all of Pinole Point's causes of action on the cross-complaint except for its claim for indemnity.[2]

Judgment was entered on April 25, 2013. Pinole Point filed a timely notice of appeal.

## DISCUSSION

Pinole Point contends that it has no legal duty to maintain the Drainage Channel, and objects to the trial court's reasonableness rulings and determination that the Drainage Channel is a natural watercourse. Pinole Point contends it has no liability for negligence and nuisance and the court should have found the County liable for tort and inverse

---

[2] As noted, the County agreed to reimburse Pinole Point the $45,000 it contributed to the settlement of the individual homeowners' claims.

condemnation. It also maintains that the remedy of an injunction was improper. As explained below, we conclude that these contentions lack merit.

## I. *Standard of Review*

Our review presumes a judgment is correct. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631-632.) The appellant has the burden of demonstrating prejudicial error based on an adequate record and appropriate legal argument. (Code Civ. Proc., § 475; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

We review de novo all questions of law, such as the trial court's decision to apply the reasonableness test. (See, e.g., *Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1272; *Gutierrez v. County of San Bernardino* (2011) 198 Cal.App.4th 831, 844.) The issue of reasonableness is a factual question (*Keys, supra,* 64 Cal.2d at p. 410), which we review to determine whether substantial evidence supports it. (*Gutierrez,* at p. 844.) In examining the sufficiency of the evidence, "we view the evidence and draw all reasonable inferences therefrom in support of the judgment. [Citation.] Credibility of witnesses and weight of the evidence are matters for the trier of fact. [Citation.] We do not substitute our views for those of the trial court. [Citation.]" (*Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 143.)

"The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citation.] The exercise of discretion must be supported by the evidence and, 'to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' [Citation.]" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.) A trial court's discretionary "ruling 'will be sustained on review unless it falls outside the bounds of reason.' [Citation.] We could therefore disagree with the trial court's conclusion, but if the trial court's conclusion was a reasonable exercise of its discretion, we are not free to substitute our discretion for that of the trial court." (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881-882.)

8

## II. *The Reasonableness Test*

Historically, under the "natural watercourse rule," upstream property owners had "immunity for any damage to downstream riparian property caused by discharge of surface water runoff into a natural watercourse." (*Locklin, supra,* 7 Cal.4th at pp. 345-346.) This immunity extended to public entities. (*Archer v. City of Los Angeles* (1941) 19 Cal.2d 19, overruled on another issue as stated in *Locklin*, at p. 337.)

The court in *Keys, supra,* 64 Cal.2d 396 held that upper property owners could be liable if they failed to exercise reasonable care in the use of their property so as to avoid injury to the adjacent property through the flow of surface waters. (*Id.* at p. 409.) The court in *Keys* concluded that an uphill landowner, who altered the natural drainage of surface waters, could be liable for damages caused by the discharge of those waters onto adjacent property, under a reasonableness of conduct test. (*Id.* at pp. 408-409.) The court explained that it is "incumbent upon every person to take reasonable care in using" his or her "property to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the duty of any person threatened with injury to" his or her "property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury." (*Id.* at p. 409.) Although not identical to a traditional negligence analysis, the central question to be determined under *Keys* is one of "reasonableness of conduct." (*Ibid.*)

The *Keys* court set forth the rules for determining liability under the reasonableness test: "If the weight is on the side of" the person "who alters the natural watercourse, then" that person "has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage. If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule" (*Keys, supra,* 64 Cal.2d at pp. 409-410) and "the lower owner wins" (*Burrows v. State of California* (1968) 260 Cal.App.2d 29, 32-33).

9

In *Locklin,* the Supreme Court extended the rule of reasonableness to apply when a public entity contributes to an increase in volume and velocity in a natural watercourse resulting in downstream property damage. (*Locklin, supra,* 7 Cal.4th at pp. 337-338.) As a result of upstream development, the watercourse in *Locklin* began carrying larger volumes of water, which caused significant erosion of the plaintiffs' properties. The defendant governmental entities were aware of the problem and could have acted to prevent the erosion. The owners of property along the watercourse sued on the basis that the upstream improvements, including the storm drain system, as well as the failure to maintain the watercourse, increased the volume and velocity of the water in the natural watercourse, causing the plaintiffs' damages. (*Id.* at pp. 339-340.) The *Locklin* court held that the trial court erred in exempting the public entities from liability, but still concluded that the public entities were not liable because the plaintiffs failed to prove that any *unreasonable* public entity conduct caused their property damage. (*Id.* at p. 367.)

In the context of inverse condemnation, *Locklin* holds that a public entity may be liable "for downstream damage caused by an increased volume or velocity of surface waters discharged into a natural watercourse from public works or improvements on publicly owned land. It will be liable if it fails to use reasonably available, less injurious alternatives, or if it has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public work." (*Locklin, supra,* 7 Cal.4th at pp. 337-338.) Such "liability exists only if the agency acts unreasonably, with reasonableness determined by balancing the public benefit and private damage in each case." (*Id.* at p. 368.) "The reasonableness of the public agency's conduct must be determined on the facts of each case, taking into consideration the public benefit and the private damages in each instance." (*Id.* at p. 367.) The departure from a strict liability standard was based on public policy: "[B]ecause strict liability would discourage construction of needed public improvements which affect surface water drainage, liability exists only if the agency acts unreasonably, with reasonableness determined by balancing the public benefit and private damage in each case." (*Id.* at p. 368, see also *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 436.)

10

The reasonableness test "requires consideration of the purpose for which the improvements were undertaken, the amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed, and the cost of mitigating measures available to both upper and downstream owners.  Those costs must be balanced against the magnitude of the potential for downstream damage.  If both plaintiff and defendant have acted reasonably, the natural watercourse rule imposes the burden of stream-caused damage on the downstream property." (*Locklin, supra,* 7 Cal.4th at p. 337.)

### III.  *The Drainage Channel Is a Natural Watercourse*

The trial court found that the Drainage Channel is a natural watercourse.  (See *San Gabriel Valley Country Club v. Los Angeles* (1920) 182 Cal. 392, 397 (*San Gabriel*); *Chowchilla Farms, Inc. v. Martin* (1933) 219 Cal.1, 18.)  "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, is known as 'surface water.'  It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake.  The extraordinary overflow of rivers and streams is known as 'flood water.' " (*Keys, supra,* 64 Cal.2d at p. 400.)

Pinole Point contends that the County is liable, even if the County acted reasonably, because the Drainage Channel is not a watercourse.  Pinole Point's argument is not entirely clear but, after *Locklin,* there is no valid reason for distinguishing between surface waters and those that flow through a natural watercourse when determining the obligations of landowners.  (See *Locklin, supra,* 7 Cal.4th at p. 352.)  The court in *Locklin* held that the rule of reasonableness applies to cases involving the discharge of surface waters whether the water is discharged onto the land of an adjoining owner or into a natural watercourse.  (*Id.* at p. 357; see also, *Biron v. City of Redding, supra,* 225 Cal.App.4th at p. 1274.)

Moreover, Pinole Point's contention lacks merit as the record supports the trial court's finding that the Drainage Channel is a natural watercourse.  As explained in

11

*Locklin:* "A natural watercourse 'is a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow.' " (*Locklin, supra,* 7 Cal.4th at p. 345.) "Alterations to a natural watercourse, such as the construction of conduits or other improvements in the bed of the stream, do not affect its status as a 'natural' watercourse." (*Ibid.*) "A natural watercourse includes 'all channels through which, in the existing condition of the country, the water naturally flows,' and may include new channels created in the course of urban development through which waters presently flow." (*Ibid.*) Where a channel has existed for a period of time and has all the attributes of a watercourse, it is immaterial that it was originally constructed artificially. (*Chowchilla Farms, Inc. v. Martin, supra,* 219 Cal. at p. 18.)

Pinole Point stresses the trial court's finding that aerial photographs showed "the absence of any defined drainage channel" prior to the construction of Montalvin Manor in the 1950s. Pinole Point argues that the Drainage Channel was built in 1957 as a mitigation effort to handle the increased drainage flow created by the Montalvin Manor development. Since there was no preexisting watercourse on the Remainder Property, Pinole Point is apparently contending that the Drainage Channel could not be transformed into a natural watercourse.[3]

The fact that the Drainage Channel did not exist in 1953 is not significant. In *San Gabriel*, for example, the court explained that the channel at issue "did not exist as a definite watercourse, at least as far as the plaintiff's land, before the region was settled up, but was created as the result of settlement. Nevertheless it is natural in the sense that it was originally made by the waters themselves[,] and not by man, although it is possible that except for the acts of man the waters would not have been kept together so as to

---

[3] Pinole Point cites *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, in support of its somewhat obtuse argument. This case is unavailing. Firstly, the defendants in *Sheffet* had not argued in the trial court that the plaintiff's drainage ditch was a natural watercourse. (*Id.* at p. 741.) Secondly, the ditch did not have characteristics of a natural watercourse. (*Ibid.*)

12

make a channel. In any event, it has now existed for such a length of time as the channel for the natural drainage of the watershed tributary to it, that the manner of its creation is not material, and it has all the attributes of a water channel wholly natural in origin." (*San Gabriel, supra,* 182 Cal. at p. 397; see also *Larrabee v. Cloverdale* (1900) 131 Cal. 96, 98-100.)

The trial court assessed the evidence using the correct definition of watercourse. It found that people constructed the Drainage Channel no later than 1957 and it has been in its present form for more than 50 years. Witnesses testified that from 1958 until 1979 the Drainage Channel featured a bed and banks. The court stated that the "only reason that the lower portions of the Remainder Parcel are not underwater in the winter months due to runoff from the hills above and frequently subject to tidal surges throughout the year from the Bay is the presence of the railroad berms[,] which effectively create a levee system protecting the Remainder Parcel. Without the berms, surface waters from upper landowners would naturally flow to the Bay across the Remainder Parcel and tidal flows from the Bay would flow in the opposite direction across the property. The Drainage Channel simply serves to facilitate that same flow given the unnatural berms that prevent that natural flow from occurring." This evidence supports the finding that the Drainage Channel is a natural watercourse.

### IV. *Pinole Point's Legal Duty*

Pinole Point asserts that it, as the downstream property owner, has no legal duty to take affirmative action to remove the sediment or to maintain the Drainage Channel, especially since the sediment buildup that is causing the blockage comes from Montalvin Manor and the sediment is of no consequence to the Remainder Parcel. (See *Gdowski v. Louie* (2000) 84 Cal.App.4th 1395, 1404 (*Gdowski*).) It asserts that cases following the holdings in *Keys* and *Locklin* "clearly allocate the duty to perform this type of [d]rainage [w]ork to the County rather than [to it], even if the County acted reasonably in making the original water diversions." Since it had no legal duty to perform or pay for work needed to benefit the upstream landowner's drainage system, Pinole Point insists the trial court never had to reach the question of the reasonableness of the parties' conduct.

13

The County responds that Pinole Point ignores the longstanding rule under Civil Code section 1714, subdivision (a), that a person is liable for injuries caused "by his or her want of ordinary care or skill in the management of his or her property . . . ." (See, e.g., *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 362 [possessor of land not immune from liability for harm caused by a natural condition of the land and liability based on duty of reasonable care enunciated in Civil Code section 1714]; *Ektelon v. City of San Diego* (1988) 200 Cal.App.3d 804, 810 [upstream landowner has no absolute right to protect land from floodwaters by constructing structures that increase downstream flow of water into natural watercourse, and court applied ordinary principles of negligence]; *Linvill v. Perello* (1987) 189 Cal.App.3d 195, 199 [property owner must act reasonably in building barriers to protect his or her property from floodwater damage].)

Pinole Point answers that Civil Code section 1714, subdivision (a), and the cases applying traditional notions of negligence to landowners are not applicable to water law cases.

We need not settle the question whether Civil Code section 1714, subdivision (a), and the cases on the general rights and liabilities of landowners are applicable to this water law case[4] because we conclude under the water law cases—*Keys, Locklin,* and their progeny—Pinole Point's argument is incorrect.

Both *Keys, supra,* 64 Cal.2d 396 and *Locklin, supra,* 7 Cal.4th 327 made clear that every property owner has a legal duty to act reasonably in the maintenance of his or her property to prevent damage to adjacent properties. " 'No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably' " in his or her " 'relations with other landowners and still be immunized from all liability.' " (*Locklin,* at p. 352, quoting *Keys,* at pp. 408-409.) Indeed, the *Locklin* court cited with approval Court of Appeal

---

**4** The Supreme Court in *Sprecher v. Adamson Companies, supra,* 30 Cal.3d 358, decided prior to *Locklin, supra,* 7 Cal.4th 327, applied the traditional notion of negligence. The court stated in a footnote: "The law governing the rights and liabilities of land owners with respect to surface waters has, to some extent, developed over the years separately and independently from tort law generally and is not considered here." (*Sprecher,* at p. 364, fn. 5.)

14

decisions (see, e.g., *Martinson v. Hughey* (1988) 199 Cal.App.3d 318 (*Martinson*)) that held "the rule of reasonableness is applicable" "to discharges into natural watercourses or flood control improvements in a watercourse." (*Locklin,* at p. 354.)

*Martinson, supra,* 199 Cal.App.3d 318, like this case, involved the failure to keep a natural watercourse free of debris. The lower owner in *Martinson* blocked a natural watercourse with debris, which backed water up onto the upper land. The court applied the rule of reasonableness and concluded: "[T]he upper owner has the right to discharge reasonable and noninjurious amounts of irrigation water through natural areas of flow onto the lower owner's property. The lower owner has a co-equal burden to receive reasonable and noninjurious amounts of irrigation water through natural flowage channels." (*Id.* at p. 328; see also *Weaver v. Bishop* (1988) 206 Cal.App.3d 1351, 1358 [rejected claim that strict liability applied and affirmed both the trial court's application of the reasonableness rule and its findings that defendants' conduct of altering the flow of the creek by placing boulders on the creek's banks was reasonable as this action was necessary to prevent the washing away of defendants' property].)

Pinole Point argues that it is relieved of any duty to protect adjoining landowners from flooding because it did not create any barrier or take any other affirmative act to "alter the natural flow of water onto the land of another . . . ." (*Gdowski, supra,* 84 Cal.App.4th at p. 1405.) It points out that the cases cited by the County involved the defendants taking some action to divert or obstruct the drainage. (E.g., *Martinson, supra,* 199 Cal.App.3d 318 [defendant constructed a berm].) Pinole Point maintains that it had no duty to volunteer to maintain the Drainage Channel simply because its predecessor had done that and it had no obligation to accommodate the drainage needs of Montalvin Manor. It claims that the Good Samaritan rule cannot create a duty to act. (See, e.g., *Paz v. State of California* (2000) 22 Cal.4th 550, 558 ["a person who has not created a peril is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act"].)

A review of the water law cases confirms that most of them involve the creation of a diversion or obstruction, and the facts of this case are somewhat unique in that they

15

involve inaction or an omission. Although this latter situation is less common, liability can be based on an *omission* or *inaction* when the failure to act is an *unreasonable use* of the property. In *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, the court held that the plaintiffs could not prevail on an inverse condemnation claim because they did not present "substantial evidence that the flooding [from the levee failure] was the result of any unreasonable act or *omission* attributable to defendants." (*Belair,* at p. 568, italics added.) Similarly, the court in *Locklin, supra,* 7 Cal.4th 327 held that the property owner's conduct "in *using* or altering the property in a manner which affects the discharge of surface waters onto adjacent property is subject to a test of reasonableness." (*Id.* at p. 351, italics added.) Whether Pinole Point's omission or failure to act was unreasonable is an issue of fact and depends upon the context of the situation, including whether it knew at the time it purchased the property that its failure to maintain the Drainage Channel would likely result in flooding on Lettia Road. (See *Keys*, *supra,* 64 Cal.2d at p. 410 [reasonableness is a factual question "to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter"].)

Pinole Point relies on *Gdowski, supra,* 84 Cal.App.4th 1395; *Pagliotti v. Acquistapace* (1966) 64 Cal.2d 873 (*Pagliotti*), a companion case of *Keys*; *Sheffet v. County of Los Angeles, supra,* 3 Cal.App.3d 720 (*Sheffet*); and a New Jersey case cited in *Keys, Armstrong v. Francis Corp.* (1956) 120 A.2d 4 (*Armstrong*). Pinole Point incorrectly maintains that these cases demonstrate that the upstream party *always* has to pay for maintenance caused by improvements it makes. It denies that it has any obligation to act in a particular manner to minimize the damage or injury caused by the County's action.

None of the cases cited by Pinole Point imposed liability solely on the basis of the flooding or injury being caused by the party's status as the upper landowner. In *Sheffet, supra,* 3 Cal.App.3d 720, the question before the court was whether substantial evidence supported the lower court's finding that the lower landowner had acted reasonably while

16

the upper landowner had acted unreasonably. Indeed, the appellate court observed that it was bound by the trial court's decision unless substantial evidence did not support the trial court's finding on reasonableness. (*Id.* at pp. 728, 731, 741.) In both *Sheffet* and *Armstrong,* the court imposed liability on the upper landowner because that party had engaged in some affirmative conduct creating the flooding problems and the adjacent property owner's actions had been reasonable. (*Sheffet,* at pp. 726-727, 731-732 [county liable in inverse condemnation for damages from overflow of surface waters from public streets onto plaintiff's property where county approved subdivision and drainage system, plaintiffs acted reasonably in relation to his property, and damage to adjacent property resulted from improvements]); *Armstrong, supra,* 120 A.2d 4 [defendant, in the course of developing large housing project, substantially augmented flow of surface water through natural channel on plaintiff's land, causing considerable damage].)[5] In the other cases cited by Pinole Point, the appellate court reversed and remanded because the trial court failed to make the requisite reasonableness findings. (*Pagliotti, supra,* 64 Cal.2d at p. 874 [reversed lower court's ruling granting upper landowners' request to enjoin lower owner from maintaining dam across property and remanded for trial court to make finding on the reasonableness of defendant's conduct in accordance with the rule set forth in *Keys, supra,* 64 Cal.2d 396]; *Gdowski, supra,* 84 Cal.App.4th at p. 1398 [trial court committed prejudicial error when it refused to instruct on *Keys* test of reasonableness and instead "instructed the jury using general principles of negligence and contributory negligence"].)

Pinole Point also maintains that it had no duty to maintain the Drainage Channel because the holder of a prescriptive easement has the duty to maintain the easement. (See, e.g., *Reinsch v. City of Los Angeles* (1966) 243 Cal.App.2d 737; *Conklin v.*

---

**5** The court in *Armstrong, supra,* 120 A.2d 4 also pronounced that "[t]he issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter." (*Id.* at p. 10.)

17

*Goodson* (1954) 125 Cal.App.2d 823; *Whalen v. Ruiz* (1953) 40 Cal.2d 294.) It concludes that "any acquisition of prescriptive rights by the County to continue using the Drainage Channel after 1979 could not shift the duty to maintain the Drainage Channel" to Pinole Point. All of these cases predate *Locklin* and both *Conklin* and *Whalen* predate *Keys. Reinsch* was filed two months after *Keys* was decided, and did not consider the reasonableness test set forth in *Keys.* After *Keys,* "[t]he modern rule governing landowner liability for surface water runoff and drainage is no longer simply a rule of property law dependent upon the existence of rights, servitudes, or easements. . . . Today a landowner's conduct in using or altering the property in a manner which affects the discharge of surface waters onto adjacent property is subject to a test of reasonableness." (*Locklin, supra,* 7 Cal.4th at pp. 351, 355-356, fn. 17.) Moreover, neither Pinole Point nor the County pled or proved in the trial court that the County has a prescriptive easement and therefore cases on prescriptive easements are inapplicable.

The trial court did not create any new legal duty. It correctly applied the modern rule of reasonableness as " '[f]ailure to exercise reasonable care may result in liability by an upper to a lower landowner.' " (*Locklin, supra,* 7 Cal.4th at p 352.) Here, Pinole Point did not create a new structure or divert the flow of water; instead, it blocked the flow of the natural waterway on its property by failing to keep it free of debris. The question whether this conduct was reasonable and whether the County as the owner of Lettia Road was reasonable in attempting to avoid or prevent injury is a factual inquiry that depends on all of the circumstances of the case. (*Id.* at p. 359.)

### V. *Liability in Tort*

The trial court found Pinole Point liable to the County in negligence and nuisance and determined that the County was not liable to Pinole Point for the "tortious diversion of surface waters." When negligent conduct interferes with another's free use and enjoyment of his or her property, nuisance liability arises. (See *Lussier v. San Lorenzo Valley Water Dist.* (1998) 206 Cal.App.3d 92, 101; see also *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542.)

18

As already noted, the civil law rule of reasonable conduct rather than traditional principles of nuisance or negligence law applies. (*Gdowski, supra,* 84 Cal.App.4th at pp. 1403-1406.) In reaffirming the test of reasonableness in the tort context, the *Locklin* court stated: "The test is whether, under all the circumstances, the upper landowner's conduct was reasonable. This rule of reasonableness applies to both private and public landowners, but it requires reasonable conduct on the part of downstream owners as well. This test requires consideration of the purpose for which the improvements were undertaken, the amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed, and the cost of mitigating measures available to both upper and downstream owners. Those costs must be balanced against the magnitude of the potential for downstream damage. If both plaintiff and defendant have acted reasonably, the natural watercourse rule imposes the burden of stream-caused damage on the downstream property." (*Locklin, supra,* 7 Cal.4th at p. 337.)

When considering the reasonableness of adjoining landowners with respect to the flow of surface waters, the court considers "all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter." (*Keys, supra,* 64 Cal.2d at p. 410.) Another factor to be considered is "whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from" his or her "alteration of the flow of surface waters." (*Ibid.*)

We have two grounds for affirming the trial court's findings on reasonableness. First, Pinole Point's appellate briefs do not " 'fairly summarize all of the facts in the light most favorable to the judgment.' " (See, e.g., *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739 ["In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment' "].) Failure to provide all material evidence amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Second, for the reasons explained below, the

19

record contains substantial evidence supporting the findings that Pinole Point's conduct was unreasonable and the County's conduct was reasonable.

The two County projects involving drainage were the approval of Montalvin Manor in the early 1950s, which resulted in connecting the 24-inch Pipe to the Drainage Channel, and the 1982 improvement project, resulting in the installation of the 54-inch Pipe. With regard to the Montalvin Manor development, Pinole Point maintains that the diversion of the water into the Drainage Channel in the 1950s was improper and that the County had safer alternatives. Additionally, Milani testified that the housing development built in the early 1950s significantly increased the volume of water, flow rate of water, and velocity of water discharged from the UP culvert into the Remainder Parcel.

The evidence in the record does not establish that the County's conduct with regard to the development of Montalvin Manor created the drainage problems. The Drainage Channel had been constructed by 1957; this Channel was maintained and kept clear of vegetation and debris until 1979, when Pinole Point purchased the Remainder Parcel. There is no evidence of any damage to the residents on Lettia Road from flooding in the 1950s, 1960s, or 1970s. Thus, even if alternative drainage methods were available to the County when it developed Montalvin Manor in the 1950s, the absence of any evidence of flooding problems prior to the 1980s supports a finding that the County's conduct in connecting the 24-inch Pipe to the Drainage Channel was reasonable.

The 1982 project involved the County's installation of additional street catch basins to capture runoff more quickly; the runoff was directed into the subdivision's underground storm drain system. The County installed a 54-inch Pipe that extended approximately 190 feet from Lettia Road through the BNSF berm near the 24-inch Pipe. The 54-inch Pipe essentially replaced the 24-inch Pipe and the 36-inch Pipe. Pinole Point argues that its evidence showed that the County did not satisfy the applicable standards of care for a storm drain design. Pinole Point's expert testified that this flawed design caused the Drainage Channel to overflow; he asserted that the County had other feasible

20

alternatives. Pinole Point maintains that the evidence showed that this drainage system caused the sediment dam deposited in the Drainage Channel.

While the evidence established that the flow capacity of the 54-inch Pipe was greater, the trial court found that Pinole Point presented no evidence that discharge from either the 24-inch Pipe or the 54-inch Pipe had caused any loss or damage to Pinole Point. The court concluded: "The evidence at trial was clear that because of the blockage on the Remainder Parcel, the 54-inch Pipe is not able to convey the anticipated rainfall from even a 2-year storm event. It can no longer handle even slight storm events, such as the four-tenths of an inch storm of March 24, 2011, without flooding Lettia Road and threatening additional damage to adjacent homes." The 1982 project, according to the court's findings, "did not in any way increase the amount of water that was discharged onto the Remainder Parcel from Montalvin Manor. Instead it merely redirected some of the water that was already discharging onto the Remainder Parcel from the 36-inch Pipe . . . ."

Evidence in the record, although not cited by Pinole Point, clearly supported the trial court's findings. Peter Morris Mesard, the County's engineering expert, testified that the County's 1982 drainage improvements did not change the total flow to the Remainder Parcel. He maintained that "the total flow from the tributary area in Montalvin Manor to the Remainder Parcel remained the same both before and after the improvements in" 1982.

The trial court also addressed Pinole Point's argument that the 54-inch Pipe increased the rate of silt deposits in the Drainage Channel and found that the 1982 Project might have "somewhat increased the rate of silt deposit in the Drainage Channel due to the increased flow in that location, [but] the same silt would have been deposited onto the Remainder Parcel through the old drainage system." This finding was supported by Mesard's testimony that there was nothing unusual about the quantities of sediment transported from Montalvin Manor to the Remainder Parcel.

In contrast to its findings regarding the County's conduct, the trial court found Pinole Point's failure to keep the Drainage Channel free of debris caused the repeated

21

flooding and posed a serious risk of future flooding. This finding was supported by testimony of Robert Van Bibber, a resident of Montalvin Manor since the late 1950s. He testified he had walked on the Remainder Parcel since moving there and observed that originally the Drainage Channel had no vegetation. At the time of the trial, he noticed that the current vegetation prevented him from even seeing a ditch there. The record contained evidence that there was a five-foot high "sediment dam" blocking the Drainage Channel a short distance downstream of the 54-inch Pipe and this dam effectively made it impossible for the 54-inch Pipe to drain the storm waters from Montalvin Manor. This evidence supported a finding that the sediment buildup that is blocking the Drainage Channel could have been avoided if the Drainage Channel had been adequately maintained and cleared of all debris and vegetation.

Additionally, prior to making his findings, Judge Steven Austin inspected the site and walked the entire length of the Drainage Channel. "This view constituted substantial evidence in support of the questioned findings, the rule being established that the trier of fact's view of an area is independent evidence which can be considered . . . in arriving at [the judge's] conclusion and is substantial evidence in support of findings consonant therewith." (*Key v. McCabe* (1960) 54 Cal.2d 736, 739.) "Such evidence may be used alone or with other evidence to support the findings." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 361-362.) In light of these established principles, we must assume that the evidence acquired by Judge Austin's observations sustained his findings that the Drainage Channel contains debris and vegetation, which caused the sediment buildup and flooding of Lettia Road.

Pinole Point contends that maintenance work is not a normal risk of land ownership and it should not be responsible for these costs. Whether the reasonable use of the property includes maintenance of a natural waterway is a factual inquiry. Here, the trial court concluded that the costs of removing the debris were normal maintenance and the cost to remedy the problem was a consequence of failing to maintain the Drainage Channel on a regular basis over the last three decades. The record supported this finding. Pinole Point knew or should have known about the Drainage Channel and the need to

maintain it when it purchased the Remainder Parcel in 1979.  The Drainage Channel was clearly visible when it purchased the property; it was obvious that without the Drainage Channel the surface waters in Montalvin Manor had no way of draining into the Bay. Furthermore, the record showed that Pinole Point knew its inaction was resulting in substantial damage to the County and homeowners on Lettia Road.  Pinole Point learned of the County's 1982 drainage improvement project.  Additionally, beginning in 1991, Pinole Point received a number of communications from the County notifying it of the flooding problems caused by the obstructed Drainage Channel.

The trial court also properly considered the County's conduct.  It found that the overall purpose served by the County's drainage projects, which allowed storm waters from Montalvin Manor to flow through the BNSF berm and into the Drainage Channel, "[c]learly" furthered "an important overall public purpose" of safely conveying storm waters.  Moreover, the court rejected Pinole Point's evidence that there were feasible alternatives and concluded that the BNSF berm precluded any other possibility.  The record supported an implied finding that the County's conduct in developing the drainage system was reasonable as no flooding occurred until Pinole Point stopped maintaining the Drainage Channel.

Additionally, the trial court ruled that the County acted reasonably in attempting to get Pinole Point to maintain the Drainage Channel and in implementing the temporary pumping program.  The County had attempted to mitigate any damage by pumping out standing water in the 54-inch Pipe in advance of any storm and using portable pumps to redirect storm waters off Lettia Road during storms.

The record amply supported the trial court's findings.  Accordingly, we affirm the trial court's determinations that Pinole Point was liable for negligence and nuisance and the County had no tort liability.

## VI.  *Liability for Inverse Condemnation*

Article I, section 19 of the California Constitution provides:  "Private property may be taken or damaged for public use only when just compensation . . . has first been

23

paid . . . ." In analyzing the inverse condemnation cause of action, we use the rule of reasonableness set forth in *Locklin, supra,* 7 Cal.4th 327.

Under *Locklin,* inverse condemnation liability attaches only where there has been damage from "an increased volume or velocity of surface waters discharged into a natural watercourse from public works or improvements on publicly owned land. [The government agency] will be liable if it fails to use reasonably available, less injurious alternatives, or if it has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public work." (*Locklin, supra,* 7 Cal.4th at pp. 337-338.)

The predicate condition of damage to the Remainder Parcel is not met here. In contrast to the cases cited by Pinole Point where the evidence established that the public entity's conduct had increased the flow of water onto the plaintiff's property (see *Yue v. City of Auburn* (1992) 3 Cal.App.4th 751, 760-762 [city approved subdivision that resulted in increased runoff on plaintiff's property]; *Inns v. San Juan Unified School District* (1963) 222 Cal.App.2d 174, 177 [school altered its property's natural surface drainage pattern, which increased volume and velocity of water released onto plaintiff's property]), here, as already discussed, the record shows that flooding did not occur as a result of building Montalvin Manor and the record supported the trial court's finding that the 1982 project did not significantly increase the amount of water discharged onto the Remainder Parcel. (See *Souza v. Silver Development Co.* (1985) 164 Cal.App.3d 165, 172 [no inverse condemnation liability where increase in flow was minimal].) Pinole Point also has cited no evidence in the record showing the County's projects caused any injury or damage to the Remainder Parcel.[6]

---

[6] Pinole Point does argue that the County's projects caused the sediment dam on the Drainage Channel. As already noted, the court found that the sediment dam was the result of Pinole Point's failure to keep the Drainage Channel clear of debris and vegetation.

We need not consider Pinole Point's arguments that the Drainage Channel was a public work.

24

Furthermore, liability is limited to situations where the public agency's *unreasonable conduct* is a substantial cause of the damage to the plaintiff's property. (*Locklin, supra,* 7 Cal.4th at pp. 362, 368, 373.)  Here, the trial court found the County's conduct to be reasonable after considering the following six factors *Locklin* identified for assessing the reasonableness of a public agency's conduct with respect to the discharge of surface waters into a natural watercourse:  "(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff."  (*Id.* at pp. 368-369.)

For the same reasons discussed with regard to tort liability, the evidence supported the trial court's findings regarding reasonableness in the inverse condemnation context:  The overall purpose of the County's improvement projects was to safely convey storm waters;  the County's projects did not cause the flooding; there were no other feasible storm drainage alternatives with lower risks; the Remainder Parcel historically had received the runoff and the water had always accumulated on this property because of the UP berm and the UP culvert; Pinole Point sustained no damage as a result of the runoff from Montalvin Manor; the only damage was the sediment deposited, which the court found not to be overly burdensome and part of every riparian landowner's maintenance obligations; and clearing a Drainage Channel is necessary when the property owner has actual or constructive notice that the property has a natural watercourse that must be maintained to prevent flooding to adjacent property.

Accordingly, we affirm the lower court's determination that the County is not liable to Pinole Point for inverse condemnation.

25

## VII. *Remedy*

### A. *Damages*

The trial court awarded the County $141,090.10 in damages for its emergency flood protection efforts. In the trial court, Pinole Point claimed the evidence did not support this sum but, other than claim it has no liability for any damages, Pinole Point has not raised any challenge in its appellate briefs to the actual amount awarded. It has therefore waived any appeal on the basis that the evidence did not support this sum.

### B. *Injunctive Relief*

In addition to awarding damages, the court granted the County's request for a permanent mandatory injunction. The court ordered Pinole Point to clear the Drainage Channel of obstructions and debris to permit the storm waters from the 54-inch Pipe to flow through the Drainage Channel and out to the Bay. Until the project is completed, the court ordered Pinole Point to operate a temporary pumping service or to make arrangements for the County to continue to provide such services. The court retained jurisdiction to ensure that Pinole Point uses its best efforts to obtain the necessary regulatory approvals.

" 'A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate. . . .' " (*Benasra v. Mitchell Silberberg & Knupp* (2002) 96 Cal.App.4th 96, 110.)

Pinole Point claims that it is unreasonable to require it to clear the Drainage Channel because the drainage work does not benefit it and the costs of doing the drainage work are very high: The County's expert estimated the cost, without including expected environmental mitigation costs, at $84,000; Pinole Point's expert testified that his plan for drainage work would cost $300,000. Additionally, regulatory permits, which could be an arduous process, are required.

We conclude that the trial court did not abuse its discretion in issuing a mandatory injunction requiring Pinole Point to clear the Drainage Channel. The trial court found

that unless the obstructions to the Drainage Channel were removed, Lettia Road and adjacent homes would be subject to frequent and repeated flooding. The costs to remedy the situation are significant because of Pinole Point's own inaction for over 30 years. Given the danger of future flooding, the trial court determined damages were "simply not adequate to remedy the harm caused by Pinole Point's inaction." Evidence in the record supported this determination, as Mesard testified that unless the blockage of the Drainage Channel was remedied, "future flooding at Lettia Road even during relatively modest storms," would occur. Thus, an injunction was necessary to prevent future injury and litigation related to the flooding. (Code Civ. Proc., § 526, subd. (a)(6).)

Moreover, the trial court had the authority to fashion an equitable remedy appropriate to the circumstances of this case. It is well established that "a court called upon to afford relief historically or analytically equitable in its nature 'has broad powers to fashion a remedy. [Citation.] It may create new remedies to deal with novel factual situations. [Citation.]' " (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1040.) Here, as already discussed, damages were an inadequate remedy and granting a request for an injunction comports with California water law. In *Costello v. Bowen* (1947) 80 Cal.App.2d 621, the defendants were enjoined from maintaining a dam across a natural watercourse or drainage channel because the dam caused overflowing and flooding of the plaintiffs' lands. (*Id.* at pp. 624, 631-632.)

The trial court noted that the Remainder Parcel includes regulated wetlands and regulatory permits are needed before clearing the Drainage Channel. The trial court acknowledged that the process for obtaining the necessary regulatory approvals for clearing and maintaining the Drainage Channel might "be arduous" but the evidence indicated it was likely these regulatory permits could be obtained. Furthermore, we agree with the trial court's determination that the regulatory permitting requirements could neither excuse nor justify Pinole Point's refusal to act because it had never applied for the necessary permits.

Pinole Point again argues that it has no legal duty to keep the Drainage Channel clear and stresses that the court could not compel it to take affirmative action. In

27

situations, such as *Costello v. Bowen, supra,* 80 Cal.App.2d 621, the defendants had caused an injury by their affirmative action, not by their inaction. As repeatedly stressed, Pinole Point had a duty to act reasonably in its relations with other landowners. (See *Locklin, supra,* 7 Cal.4th at p. 352.)

For these reasons, we conclude that the trial court acted within its discretion when it issued a mandatory injunction that requires Pinole Point, using any proposal of its choosing, to clear the Drainage Channel and to provide storm water pumping services until the Drainage Channel is cleared.

## DISPOSITION

The judgment is affirmed. Pinole Point is to pay the costs of appeal.

_____

Kline, P. J.

We concur:

_____

Stewart, J.

_____

Miller, J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Steven K. Austin |
| Attorneys for Cross-defendant, Cross-complainant and Appellant: | Plageman, Lund & Cannon, LLP<br>Richard W. Lund<br>Shana Margolis Goldberg |
| Attorneys for Cross-complainant Cross-defendant and Respondent and for Cross-defendant and Respondent: | Gordon, Watrous, Ryan, Langley, Bruno & Paltenghi<br>Dylan T. Radke<br><br>Hill, Farrer & Burrill, LLP<br>Paul M. Porter<br><br>McNamara, Ney, Beatty, Slattery, Borges & Ambacher, LLP<br>Timothy J. Ryan |