Filed 1/28/16  SoCal Self Storage-Loma Linda v. Clark CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SOCAL SELF STORAGE-LOMA LINDA, LP,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>RAYMOND J. CLARK et al.,<br><br>        Defendants and Respondents.<br>_____ | D068697<br><br><br><br>(Super. Ct. No. CIVDS1200111) |
| SOCAL SELF STORAGE-LOMA LINDA, LP,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>LOMA LINDA UNIVERSITY,<br><br>        Defendant and Respondent. | D068698<br><br><br><br>(Super. Ct. No. CIVDS1200111) |

CONSOLIDATED APPEALS from judgments of the Superior Court of San

Bernardino County, John M. Pacheco, Judge.  Judgments affirmed.

DiJulio Law Group and R. David DiJulio, Daniel A. Cantor for Plaintiff and Appellant.

Yoka & Smith and Stephen H. Smith, Peter W. Felchlin, Lauren A. Lofton for Defendants and Respondents Raymond J. Clark, Carol A. Clark and Clark Family Holdings, LLC.

Clayson, Mann, Yaeger & Hansen and Roland C. Bainer, Emily C. Meeson for Defendant and Respondent Loma Linda University.

Plaintiff and appellant SoCal Self Storage-Loma Linda, LP (SoCal) appeals from summary judgments in favor of defendants and respondents Clark Family Holdings, LLC (Clark)[1] and Loma Linda University (University) on SoCal's second amended complaint for negligence, nuisance, trespass and conversion seeking damages from mud, rocks, water and debris coming onto SoCal's storage facility after a large storm occurred in December 2010.  The trial court granted summary judgments in Clark's and University's favor on several grounds, including that neither Clark nor University breached any duty or reasonably foresaw SoCal's damages, they did not cause SoCal's damages as the damages were due to an overflowed flood control basin and failure of SoCal's masonry wall, and/or the water flowing from Clark's or University's buildings was not a substantial factor in SoCal's damages.

---

[1] The summary judgment in Clark's favor was also granted in favor of individual defendants Raymond J. Clark and Carol A. Clark.  SoCal has elected not to pursue its appeal of the judgment as to the individual defendants.

2

Asserting the trial court erred by not applying *Keys v. Romley* (1966) 64 Cal.2d 396 (*Keys*), SoCal contends it presented undisputed evidence that Clark and University diverted drainage from its natural flow onto SoCal's property, and neither defendant presented evidence that SoCal's conduct was unreasonable, precluding summary adjudication on its negligence cause of action. SoCal makes similar arguments as to its causes of action for nuisance, trespass, and conversion. SoCal alternatively contends that for purposes of the *Keys* analysis, it raised triable issues of material fact as to whether the harms it suffered were foreseeable, whether defendants' conduct was unreasonable, and whether its own conduct was reasonable, precluding summary judgment.

We are unpersuaded by SoCal's arguments. Because the summary judgments were properly granted, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

*Background*

Clark and University both own parcels of property within the Mountain View Plaza Shopping Center (shopping center) in Loma Linda, California (City). Clark has owned its parcel (the Clark property) since about 2006-2007; Raymond and Carol Clark originally leased the Clark property in late 1998, then purchased it in 2002, subsequently transferring it to Clark. The Clark property consists of a food market and a number of parking spaces immediately in front of the market. The improvements preexisted Clark's

---

[2]     We state the undisputed facts from the parties' separate statements. In its opposing separate statement, SoCal frequently stated that certain facts were "undisputed, but materially incomplete." It then referred to its own opposing evidence and declarations, much of which, as we discuss below, was excluded for purposes of Clark's motion.

ownership; Clark did not build, develop or grade its property. University has owned its parcels since 1996. The shopping center contains other buildings and an asphalt parking surface that slopes predominantly to the north and to a lesser degree to the east.

Since 1985, SoCal has operated a storage facility (at times SoCal's property) located on Mountain View Avenue, consisting of individual storage units with metal roll-up doors, an office and a small residence, all on asphalt. Before December 22, 2010, the storage facility's perimeter included masonry structures, masonry wall sections and a motorized, rolling metal gate at the main entrance. Drainage exited through a masonry wall section in the storage facility's northwest corner. The storage facility's southern boundary abuts the shopping center's asphalt parking. North and east of the storage facility are railroad tracks, with a flood control channel further north. In between the storage facility and the Clark property is a parcel of land that is not owned by Clark or its members.

In December 2010, San Bernardino and Riverside Counties experienced about five days of significant rainfall. The rainwater in the area of the shopping center dislodged a tremendous amount of mud, rocks, and debris in the hills to the south, some of which was carried by fallen rain to the Scott Canyon Basin (the basin), which was built to collect seasonal rainwater. The basin is not owned or maintained by Clark or University. On December 22, 2010, the basin failed, causing much of the collected water, mud, rocks and debris to overflow its banks and run from the basin onto Mountain View Avenue for several blocks. The flow entered the shopping center at Mountain View Avenue and at a City access road to the west of SoCal's property, traveled over Clark's and University's

4

properties, then entered the storage facility's main entrance, filling its northwest areas with mud, rocks, water and debris several feet high.  In addition, two sections of a steep slope built by City along Mountain View Avenue failed, sending a substantial amount of mud, dirt and debris into the access road, which blocked the storage facility's drainage.  A storm drain installed by City at the end of the access road also clogged and failed to function.  The storage facility continued to fill with water, mud, dirt and debris until one of its masonry walls collapsed, triggering a massive surge of mud, water and other debris out of the storage facility and into the access road that caused significant damage to the structure and contents of the storage units.

During years of ownership, the flow of water on the Clark property has typically travelled northbound over the adjacent property of others in the shopping center, and ultimately into or around SoCal's property before making its way to the nearby flood channel.  The water that inundated the Clark property in December 2010 did not originate from its property, but merely passed through it on its way to the channel.  Since 1998, the Clark property has never been inundated by water, mud, rocks and/or debris in a manner similar to what had occurred in December 2010; Clark had no knowledge of any water flow issues or similar flooding and it never experienced any significant issues with surface water flow or flooding.

Similarly, University's parcel has not been inundated by water, mud, rock and/or debris since University's acquisition of it in 1996.

5

*SoCal's Lawsuit and Defendants' Motions for Summary Judgment/Adjudication*

SoCal sued Clark, University and others for damages stemming from the December 2010 rainfall and flooding. It eventually filed a second amended complaint alleging causes of action against Clark and University for negligence, nuisance, trespass and conversion.

University moved for summary judgment or alternatively summary adjudication of issues. As to the negligence cause of action, it argued *Keys*, *supra*, 64 Cal.2d 396 was inapplicable because the damage to SoCal's property was caused by floodwaters and not surface waters, and that the matter was governed by the so-called "common enemy" rule, under which an owner could protect his land by diverting floodwater over another's land, as long as that owner did not unreasonably benefit at the expense of adjoining landowners. It argued *Keys* likewise did not apply to stream water or water collected in a wash basin. University argued it took no action to unreasonably benefit itself at SoCal's expense, compelling a finding that it was not negligent. With respect to nuisance, University argued SoCal could not show it created a condition that was either harmful to health, obstructed the use of SoCal's property, or interfered with SoCal's use and enjoyment of its property. As to trespass, University argued it did not own or maintain the failed flood control basin from which the damaging flow came, and SoCal could not establish it caused water, mud, debris to enter SoCal's property. As to conversion, University argued SoCal could not establish it intentionally and substantially interfered with SoCal's personal property. As to all of the causes of action, University further argued there was nothing it could do to prevent the floodwaters from flowing to the

6

lowest point onto SoCal's property, and its failure to take action did not contribute to, and could not be a substantial factor in, causing SoCal's harm.

Clark also moved for summary judgment or alternatively summary adjudication of issues. It argued that regardless of whether the flow from the rainstorm was characterized as a flood or surface water, it had no liability because it did not engage in any conduct to cause SoCal's injuries. Specifically, Clark asserted, via a declaration of Raymond Clark, it did nothing to cause the water, mud, rocks and debris to enter SoCal's property, nor did it redirect the water onto SoCal's property or cause the errant flow of water, mud, rocks and debris. Additionally, Clark asserted that at no time before December 2010 had it altered or improved its parcel including by repaving or grading the parking lot or changing or improving upon the drainage system in place so as to affect the manner in which water flowed off its property. Clark further argued the damage to SoCal's property was not reasonably foreseeable, presenting SoCal's discovery responses that in the 26 years SoCal had owed the facility, there had never been flooding to the extent of what had occurred in December 2010, nor was SoCal aware of water flow issues or flooding before its ownership of the facility. Clark finally argued that given the lack of foreseeability, it owed no duty to SoCal, but also given the lack of any detrimental conduct on its part, it did not cause or contribute to SoCal's damages. For these reasons, Clark argued summary judgment or adjudication was warranted on SoCal's causes of action for trespass, nuisance, and conversion.

SoCal opposed the motions, making almost identical arguments and referring to Clark and University collectively in terms of their alleged interference with the area's

7

natural drainage. SoCal conceded that Clark did not build, develop or grade its property, nor did it divert, attempt to divert, or in any way alter the flow of the water, mud, rocks and debris that entered its property. SoCal likewise conceded that University did not divert or attempt to divert the water, mud, rocks, debris away from its property. Rather, SoCal argued the defendants had interfered with the area's natural northeastward drainage in three ways: the preexisting buildings on the shopping center's east side created a "wall" blocking flow; the buildings created an "impenetrable barrier" in the east that stepped down to the north; and Clark and University collected rainfall on their buildings via roof drains that discharged water into the shopping center's parking area, using "uncontrolled sheet flow" to discharge the water onto SoCal's property. SoCal argued that despite public warnings to sandbag, the defendants "took no action to control their discharge," but instead discharged the mud, rocks, water and debris onto SoCal's property, rendering them either liable as a matter of law under *Keys*, *supra*, 64 Cal.2d 396, or presenting a fact issue for the jury.

Presenting supporting declarations from SoCal's general partner and manager Dennis Geiler, SoCal maintained that Clark's and University's conduct was unreasonable for purposes of applying *Keys* because they either did not pay to install inlets (Clark) or install *more* inlets (University), and both had two days notice that the storm was approaching but did not sandbag their property, knowing that water entering it would discharge onto SoCal's property. SoCal also submitted in opposition declarations of geologist Cathrene Glick, who likewise stated that Clark and University used uncontrolled sheet flow to discharge water from the shopping center parking areas to

8

SoCal's property, and also stated that the use of inlets and sandbags would have minimized SoCal's damages. Glick stated that a reasonable stormwater pollution prevention plan would have included sandbags or a similar barrier system. In response to University's motion, SoCal supplemented Glick's declaration with a runoff evaluation report addressing the efficacy of sandbags.

In reply, Clark objected to the Geiler and Glick declarations. In part, it asserted that because Geiler was merely a manager who worked at SoCal's facility for several years, he lacked sufficient knowledge to give expert scientific opinions. Clark also pointed out that Glick had not performed any water flow testing to determine the direction the water would flow during the storm if sandbags or other proactive measures had been taken, and that her opinions lacked foundation and were speculative, inadmissible and improper. University did not object to SoCal's opposing evidence.

*The Court Grants Summary Judgments in favor of Clark and University*

The court ruled on Clark's motion in December 2013, and on University's several months later in March 2014. It sustained Clark's evidentiary objections to Geiler's conclusions concerning the shopping center's drainage systems, uncontrolled sheet flow, and surface water flow, as well as Glick's conclusions concerning uncontrolled sheet flow and the effectiveness of inlets and sandbagging. It granted summary judgments in Clark and University's favor, ruling neither Clark nor University breached any duty or reasonably foresaw SoCal's damages; they did not intentionally, negligently, or recklessly enter SoCal's property or interfere with its use and enjoyment since the mud, rocks and debris did not originate from Clark or University; they did not dispossess SoCal of its

9

personal property as there was no evidence that the alleged water coming from their buildings had any substantial factor in creating the failures at the storage facility that swept the personal property from within the storage units; and they did not cause SoCal's damages as those damages arose because of the basin overflowing and the breach of SoCal's masonry wall at the northwest end of its facility. As to Clark, the court also ruled that the water directed from its building's roof was not a substantial factor in the damages suffered by SoCal.

SoCal appealed from the ensuing judgments.

DISCUSSION

I. *Summary Judgment Principles*

"A trial court properly grants a motion for summary judgment where 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] . . . '[W]e take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Hartford Cas. Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

A defendant moving for summary judgment "must show that the plaintiff has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474,

10

499-500.) If the defendant carries this burden, the opposing party is then subjected to a burden of production to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id*. at p. 850.)

## II. Keys *and the Rule of Reasonableness*

Because the parties' arguments require an understanding of the rule stated in *Keys*, *supra*, 64 Cal.2d 396, we review that case and later developments. In *Keys*, the defendant leased property that abutted the plaintiffs' property, which the plaintiffs used for a store. (*Id.* at pp. 398-399.) The defendant began constructing an ice rink and paved the area around the building with asphalt, which entailed grading and leveling the land, as well as placing downspouts so that rainwater was directed onto the paved area alongside the rink, then onto plaintiffs' property. (*Id*. at p. 399.) After the plaintiffs' property was flooded by surface waters flowing from defendant's land, they sued defendant and the lessors, and the trial court awarded damages as well as an injunction restraining the defendant from further damaging their property. (*Ibid*.) In reaching this award, the trial court found the defendant had "gathered surface waters on his land by artificial means and discharged said waters onto the lower land of plaintiffs in a greater volume and in a different manner than had occurred prior to the construction on his property." (*Id*. at p. 400.)

11

On appeal, the California Supreme Court discussed the various doctrines that had evolved to govern surface waters.[3] (*Keys*, *supra*, 64 Cal.2d at pp. 400-405.) In so doing, it explained the difference between surface water and floodwater: "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain [or] snow . . . is known as 'surface water.' It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse . . . . The extraordinary overflow of rivers and streams is known as 'flood water.' " (*Id*. at p. 400.) The court explained that in California, as to both urban and rural areas, the rights and liabilities of adjoining landowners with respect to flow of surface waters had generally been determined by the rule of civil law, under which the owner of an upper estate was entitled to discharge surface water as the water naturally flows, and was liable for any damage he caused to adjacent property by the discharge of water in an unnatural manner. (*Id*. at pp. 406, 408.) Though this was the case, the court found the rule could be unnecessarily rigid and unjust in developed areas (*id*. at p. 407), and that principles of tort liability were appropriately applied such that "[n]o party, whether an upper or a lower landowner, may act arbitrarily

---

[3] One such rule was the common enemy rule. (*Keys*, *supra*, 64 Cal.2d at pp. 400-402.) The court explained that the common enemy rule, "[s]tated in its extreme form, . . . holds that as an incident to the use of his own property, each landowner has an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners, who have the right to protect themselves as best they can." (*Id*. at p. 400.) But the court stated that, apparently with respect to surface waters, "the common enemy rule . . . has never been followed in California, and, in fact, was summarily rejected nearly a century ago . . . ." (*Id*. at p. 406.)

and unreasonably in his relations with other landowners and still be immunized from all liability."  (*Id*. at pp. 407-409.)[4]

The *Keys* court thus modified the civil law rule to establish a rule turning on the reasonableness of the landowners' conduct:  "It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface waters.  Failure to exercise reasonable care may result in liability by an upper to a lower landowner.  It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.  [¶]  If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule.  [¶]  . . .  Our rule has the advantage of predictability, in that responsibility for diversion of surface waters is fixed, all things being relatively equal."  (*Keys*, *supra*, 64 Cal.2d at pp. 408-409.)  *Keys* made clear that "the question is not one of strict negligence accountability, although . . . 'an owner should not escape liability when he is negligent.'  The question is reasonableness of conduct."  (*Keys*, at p. 409.)

---

4    In reaching this conclusion the *Keys* court stated:  "As pointed out by Kinyon and McClure in their article [*Interferences With Surface Waters* (1940)] 24 Minnesota Law Review 891, at page 936, 'There is no question, however, that one's liability for interfering with surface waters, when incurred, is a tort liability.  An unjustified invasion of a possessor's interest in the use and enjoyment of his land through the medium of surface waters, or any other type of waters, is as much a tort as a trespass or a private nuisance produced by smoke or smells.' "  (*Keys*, *supra*, 64 Cal.2d at pp. 407-408.)

13

The court in *Keys* further explained:  "The issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter.  [Citation.]  It is properly a consideration in land development problems whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters.  [Citation.]  The gravity of harm is its seriousness from an objective viewpoint, while the utility of conduct is its meritoriousness from the same viewpoint.  [Citation.]  If the weight is on the side of him who alters the natural watercourse, then he has acted reasonably and without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage.  If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule."  (*Keys*, *supra*, 64 Cal.2d at p. 410.)

In *Ektelon v. City of San Diego* (1988) 200 Cal.App.3d 804, 810, a panel of this court held that *Keys* "postulated a broad rule of reasonableness to be applied to all factual situations" (*id*. at p. 808) and thus "an upstream landowner has no absolute right to protect his land from floodwaters by constructing structures which increase the downstream flow of water into its natural watercourse, but is instead governed by the ordinary principles of negligence."  (*Id*. at p. 810.)  *Ektelon* relied on *Linvill v. Perello* (1987) 189 Cal.App.3d 195, in which the court reversed a summary judgment and held a

14

property owner was required to act reasonably under all circumstances when building barriers to protect his property from damage by floodwaters. (*Ektelon*, 200 Cal.App.3d at pp. 808-809, citing *Linvill*, at pp. 197, 198.) In *Weaver v. Bishop* (1988) 206 Cal.App.3d 1351, the appellate court rejected application of the common enemy doctrine applicable to floodwaters in favor of a rule of reasonableness: "[T]he nearly unanimous trend has been away from per se rules based on categorical judgments of 'generally perceived reasonableness,' [which underlies the common enemy rule,] and toward fact-based determinations of reasonableness in the particular circumstances of each case." (*Id.* at p. 1357.) The *Weaver* court pointed out "it is now held that the 'common enemy' doctrine itself is qualified by a reasonableness requirement . . . ." (*Ibid.*, citing *Linvill*, at p. 199 [applying *Keys* to the diversion of floodwaters].) In *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, the California Supreme Court acknowledged the *Linvill* and *Ektelon* application of *Keys* to situations involving flood and stream waters in actions between private landowners. (*Belair*, at p. 567, fn. 9.)

In *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 (*Locklin*), the California Supreme Court expanded the application of the *Keys* reasonableness standard to situations involving a natural watercourse. (*Locklin*, at p. 337.)[5] It began its discussion

---

5      *Locklin* dealt in part with the immunity provided by the so-called natural watercourse rule, which privileged certain landowner conduct to discharge water into a natural watercourse or make improvements in stream beds to improve drainage. (See *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 612, fn. 9.) *Locklin* defined a natural watercourse as " 'a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow.' " (*Locklin*,

15

of the rule by acknowledging that "[t]he modern rule governing landowner liability for surface water runoff and drainage is no longer simply a rule of property law . . . . Today a landowner's conduct in using or altering the property in a manner which affects the discharge of surface waters onto adjacent property is subject to a test of reasonableness." (*Id*. at p. 351.)  In reaching its decision, *Locklin* agreed with *Ektelon v. City of San Diego*, *supra*, 200 Cal.App.3d 804, *Weaver v. Bishop*, *supra*, 206 Cal.App.3d 1351, and other courts that had held the *Keys* rule "applicable to all conduct by landowners in their disposition of surface water runoff whether the waters are discharged onto the land of an adjoining owner or into a natural watercourse . . . . "  (*Locklin*, 7 Cal.4th at pp. 354-355, 357.)  The California Supreme Court also acknowledged its past recognition that the *Keys* rule of reasonableness had been applied by the courts to actions involving private landowners' treatment of flood and stream waters.  (*Id*. at p. 354, fn. 16, citing *Belair v. Riverside County Flood Control Dist.*, *supra*, 47 Cal.3d at pp. 567-568, fn. 8.)

    *Locklin* held that "[w]hen alterations or improvements on upstream property discharge an increased volume of surface water into a natural watercourse, and the increased volume and/or velocity of the stream waters or the method of discharge into the watercourse causes downstream property damage, a public entity, as a property owner, may be liable for that damage.  The test is whether, under all the circumstances, the upper

---

*supra*, 7 Cal.4th at p. 345.)  It includes a canyon or ravine through which surface water customarily flows in rainy seasons, as well as " 'all channels through which, in the existing condition of the country, the water naturally flows,' and may include new channels created in the course of urban development through which waters presently flow.  [Citation.]  Once surface waters have become part of a stream in a watercourse, they are no longer recognized as surface waters."  (*Ibid*.)

16

landowner's conduct was reasonable. This rule of reasonableness applies to both private and public landowners . . . ." (*Locklin*, *supra*, 7 Cal.4th at p. 337.) The test for reasonableness "requires consideration of the purpose for which the improvements were undertaken, the amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed, and the cost of mitigating measures available to both upper and downstream owners. Those costs must be balanced against the magnitude of the potential for downstream damage." (*Id*. at p. 337.) The key difference between *Keys* and *Locklin* is that under *Locklin*, when both upper and lower landowners act reasonably in discharging and receiving surface water in a natural watercourse, the upper landowner is immune and the *lower landowner* is liable, as "the natural watercourse rule imposes the burden of stream-caused damage on the downstream property." (*Locklin*, at p. 337.)

We conclude that after *Locklin*, there is no reason to distinguish between the source, type or nature of waters that flow over or upon a landowner's property in applying the reasonableness test. The *Keys* reasonableness standard governs a landowner's tort liability for damage caused by his or her diversion of waters whether they are discharged directly onto an adjacent property or into a natural watercourse, as well as a landowner's liability for efforts to protect his land from floodwaters. (*Locklin*, *supra*, 7 Cal.4th at p. 354, fn. 16; *Ektelon*, *supra*, 200 Cal.App.3d at pp. 808-809; accord, *Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 928 (*Contra Costa*) [after *Locklin* there is no valid reason for distinguishing between surface waters and those

17

that flow through a natural watercourse when determining the obligations of landowners].)

### III. *Liability in Tort for Negligence and Nuisance*

SoCal sued Clark and University in tort for both negligence and nuisance. " 'Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573.)  " 'Duty, being a question of law, is particularly amenable to resolution by summary judgment.' " (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154.)  And foreseeability of harm, which is likewise a question of law, is a " ' "crucial factor" ' in determining the existence and scope of that duty." (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1189; *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1146.)  "When negligent conduct interferes with another's free use and enjoyment of his or her property, nuisance liability arises." (*Contra Costa*, *supra*, 235 Cal.App.4th at p. 934.)

The main premise of SoCal's appellate argument is that *Keys* is the controlling authority, and that *Keys* "is triggered when an upper landowner diverts water from its natural flow."  SoCal argues the trial court erred by failing to apply *Keys* but rather confused it with negligence, and because it is "undisputed" that both Clark and University diverted surface or floodwater from its natural flow and into SoCal's property, the court erred by failing to address whether Clark and University had diverted water from its

18

natural flow and granting summary judgment.[6]  More specifically, SoCal argues that the shopping center contained a drainage system that blocked easterly drainage, and the system collected or routed drainage down its parking area into SoCal's facility.  It acknowledges that Clark had asserted it had purchased its property with the drainage systems in place, and that University claimed it did not divert water.  SoCal apparently maintains they were not mere purchasers or passive actors because they engaged in "affirmative conduct by *using* their properties, and their drainage systems."  SoCal further points to its expert Glick's testimony that the December 2010 storm was well publicized, warnings to sandbag were given, and had Clark and University sandbagged, the damage would have been significantly reduced.

The foregoing discussion (part II *ante*) demonstrates that the relevant inquiry, for purposes of assessing the tort liability of Clark and University for water runoff and drainage, is not merely whether they diverted waters as SoCal maintains, but the *reasonableness* of their actions to the extent they did so:  " 'Failure to exercise reasonable care may result in liability by an upper to a lower landowner.' "  (*Locklin*, *supra*, 7 Cal.4th at p. 352.)  On defendants' motions for summary judgment, we therefore evaluate whether there is evidence for a trier of fact to decide that Clark and University

---

[6]    We do not address SoCal's specific arguments about asserted errors committed by the trial court.  The trial court's reasoning is irrelevant as our role on appeal is to review the parties' summary judgment papers de novo.  (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 457-458.) In any event, the court expressly recognized in ruling on both Clark's and University's motions that *Keys* was the relevant test: whether Clark and University acted reasonably in relation to the management and care of their property with respect to the drainage of water across it.

*unreasonably* altered or used their property *in a manner that affected the discharge of water* onto SoCal's property. (See *id*. at p. 351; *Keys*, *supra*, 64 Cal.2d at pp. 409-410; *Gdowski v. Louie* (2000) 84 Cal.App.4th 1395, 1400, 1403.) Applying this standard on our de novo review compels us to reject SoCal's arguments.

A. *There is No Evidence SoCal's Damage Was the Result of any Unreasonable Action or Inaction by Clark with Respect to the Flow of Waters on Clark's Property*

As indicated above, for purposes of Clark's motion, the court excluded SoCal's opposing opinions of Geiler and Glick as to the defendants' interference with the natural drainage, the creation of a drainage system, the asserted use of uncontrolled sheet flow, the flow and impact of water due to heavy rains, the use of a stormwater pollution prevention plan, and the efficacy and consequences of sandbagging. SoCal does not challenge these evidentiary rulings or attempt to demonstrate the court abused its discretion in those rulings. (See *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 [applying abuse of discretion standard to court's final rulings on evidentiary objections on a motion for summary judgment].) Indeed, SoCal essentially ignores the rulings in its arguments, when it points to the expert and nonexpert testimony to argue, among other things, the shopping center's drainage system is diversionary. As to Clark, we therefore disregard those excluded portions of Geiler's and Glick's opinions in our review. (Code Civ. Proc., § 437c, subd. (c) [court shall consider all evidence set forth in summary judgment papers except that to which objections have been made and sustained].)

Thus, the universe of facts as to Clark—undisputed by SoCal—is simply that Clark engaged in no use or alteration of its property that changed the flow of surface or

20

floodwater: Clark did not build, develop or grade its property, and it did not divert or attempt to divert or alter the flow of water, mud, rocks and debris that flowed over its property during the December 2010 rainstorm. The evidence is undisputed that the flooding began with the overflow of the Scott basin, which resulted in a tremendous flow of floodwater toward, into and over Clark's and SoCal's property, the failure of City-built slopes and drains, the additional failure of SoCal's own drainage, and the eventual inundation of SoCal's property, which was heavily damaged when its masonry wall failed. Further, because the court excluded Glick's conclusions regarding sandbagging, Clark's failure to pay for inlets in the parking areas, and the effect of inlets on the storage facility's damages, there is no evidence that any *unreasonable omission* or *inaction* by Clark on its part either altered or diverted the flow of water, or caused SoCal's damages. (See *Contra Costa*, *supra*, 235 Cal.App.4th at pp. 931-933.)[7]

---

[7]     In *Contra Costa*, the court pointed out that in the water law diversion context, "liability can be based on an *omission* or *inaction* when the failure to act is an *unreasonable use* of the property." (*Contra Costa*, *supra*, 235 Cal.App.4th at p. 931, citing *Belair v. Riverside County Flood Control Dist.*, *supra*, 47 Cal.3d 550, 568 [plaintiffs could not prevail on an inverse condemnation claim because they did not present "substantial evidence" that flooding from a levee failure "was the result of any unreasonable act or *omission* attributable to defendants" (italics added)].) In *Contra Costa*, the evidence showed a private property owner knew or should have known of an existing large drainage channel on its property and the need to maintain it to prevent flooding of an adjacent residential development; it was obvious that without a properly operating channel, surface waters in the adjacent development had no way of draining; and the private owner had been warned multiple times of flooding problems caused by the obstructed channel. (*Contra Costa*, at pp. 923-924.) The appellate court acknowledged that whether that owner's omission or failure to act in that case was unreasonable under *Keys* was an issue of fact and "depends upon the context of the situation, including whether it knew at the time it purchased the property that its failure to maintain the Drainage Channel would likely result in flooding on Lettia Road." (*Contra*

21

We reject SoCal's argument that Clark somehow engaged in affirmative conduct by merely *using* its property in its present state. The argument misses the point, namely, that there must be evidence raising a triable issue of fact as to whether Clark used its property in a manner as to divert or discharge waters on it, and whether that use was a substantial cause of damage to SoCal's property. (*Locklin*, *supra*, 7 Cal.4th at pp. 367, 351 [landowner's conduct in "using . . . [its] property *in a manner which affects the discharge of surface waters* onto adjacent property" (italics added) is subject to the *Keys* reasonableness test].) On this evidence, a reasonable fact finder can only come to one conclusion. (Accord, *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1531-1532 [causation is ordinarily question of fact that cannot be resolved by summary judgment, but the issue may be decided as a question of law if under undisputed facts, there is no room for a reasonable difference of opinion]; *Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1687.) Mere ownership of developed property, without some act or omission impacting the discharge of water, is not a use that "affects the discharge of . . . waters . . . ." (*Locklin*, *supra*, 7 Cal.4th at p. 351.)

SoCal argues in the alternative that if a jury found Clark's failure to act to be reasonable, then the jury would "likely find SoCal's failure to act was reasonable also . . . given the expert's testimony that SoCal could not significantly mitigate damages by

_____

*Costa*, at p. 932.) It held the evidence supported the trial court's conclusion that the private owner was " 'entirely unreasonable' " by failing to keep the drainage channel free of debris, causing repeated flooding and serious risk of future flooding. (*Id*. at pp. 924, 936.) Here, Clark's inaction is entirely unlike that in *Contra Costa*; there is no evidence Clark somehow failed to maintain its property with respect to water flow or had prior knowledge of surface water or flooding impacting SoCal's property.

sandbagging on its own." SoCal also argues that a jury could not find its own conduct unreasonable, as there is no evidence it engaged in any affirmative conduct to increase the danger to its storage facility. The argument misunderstands the *Keys* rule as it applies to developed property, under which a landowner incurs *no liability* when, viewed objectively, the utility of his or her use of his land outweighs the gravity of harm caused by the use. (*Keys*, *supra*, 64 Cal.2d at p. 410.) But SoCal's arguments fail nevertheless because they depend on Glick's excluded opinions and statements as to sandbagging. Additionally, the prerequisite to applying *Keys* is a landowner's act or omission that has somehow altered the flow of waters to the detriment of another owner, and here, there is no evidence that any unreasonable action, omission or use by Clark of its property has done so. Under these circumstances, there is no basis to apply *Keys*. (See *Gdowski v. Louie*, *supra*, 84 Cal.App.4th at p. 1405 ["[I]n this case were the jury to find that both defendants and plaintiff acted reasonably, defendants would still be liable (*assuming a finding they had altered the natural flow of waters*)" (italics added)].)

B. *University's Tort Liability for Negligence or Nuisance*

We address University's motion separately, because University did not object to SoCal's opposing evidence. Thus, the question is whether University met its threshold burden to show the absence of triable issues of fact as to one or more elements of SoCal's negligence and nuisance causes of action, and then whether SoCal's evidence, including Geiler's declaration describing University's drainage and drainage failures, and Glick's declaration regarding the need to sandbag or install inlets, raised material issues on that question for a jury.

23

It is of no consequence that University's summary judgment arguments on the matter were not focused on the relevant *Keys* standard. University also argued that SoCal could not establish causation, and to that end, University presented evidence from its property coordinator and from SoCal's own discovery responses that University did not divert or attempt to divert the water, mud, rocks and other debris away from its property onto SoCal's property, that some of the mud, rocks and debris had originated from the hills that drained into the basin, and that the mud rocks and debris did not originate from University's property, but had rushed in from Mountain View Avenue. SoCal conceded that University took no action to divert or attempt to divert the floodwater, mud, rocks and debris that had overflowed the basin and travelled from Mountain View Avenue.

SoCal's opposing theory of tort liability, as reflected in Geiler's declaration, was that the drainage from University's buildings and gutter system diverted the natural flow of surface and floodwaters, rendering University liable under *Keys*. Geiler stated that University's gutter system overflowed during heavy rains, and that the rainflow, combined with roof discharge of water from University's existing buildings, pooled and flowed over a sidewalk, across another gutter, and into the facility through its main entrance. Geiler asserted that a University gutter sitting on the facility's south property line would overflow or pool in heavy and light rains, causing water to seep through a wall of a residence at the facility and forcing SoCal to replace carpet and flooring a number of times. According to Geiler, because University would not fix this problem, SoCal ultimately paid for a curb to address it. However, Geiler also stated that the shopping center drainage changed in 2009 when the city of Loma Linda widened Mountain View

24

Avenue, thereby routing more water through a narrower area, and creating a sluice that "restricts drainage and increases flow velocity between [Mountain View Avenue] and the Facility and the Shopping Center."

As Geiler describes it, it is University's *inaction*—the failure to take affirmative steps to maintain, improve or repair its drainage and gutter system—that serves as the supposed basis for University's tort liability. Glick's declaration similarly indicates University's liability would arise from inaction: that is, University's failure either to affirmatively redirect uncontrolled sheet flow (which by definition, is not the result of any conduct by University), create barriers with sandbags to stem the floodwaters, or install additional inlets in the shopping center parking lot west of their eastern buildings before December 22, 2010. According to Glick, had sandbags been used, the water entering the facility would have drained out of the facility and its northwest masonry wall would not have fallen, eliminating the damage to its storage unit doors and reducing the sediment at the facility.[8] Glick also averred that had University placed additional inlets, those inlets would have helped discharge the water entering the parking lot, and "would have helped to further reduce the [storage f]acility's damage." But in her preliminary

_____

[8]    Glick's supplemental report reaches a similar conclusion. She states: "Implementation of standard flood prevention plans, or stormwater pollution prevention plans, for the Mountain View Plaza shopping center including placement of sandbags along Mountain View Avenue property boundary would have retained the sediment and debris within the Mountain View avenue right-of-way. It is our opinion that placement of a row of sandbags (typically 3-bags high in a triangular fashion) placed along the western extent of the parking lot areas (parallel to the direction of water flow) would have been sufficient to retain the sediment and debris on the street and sidewalk areas thus reducing or avoiding the inflow of sediment and debris to the parking lot and into the subject storage facility."

hydrologic assessment and runoff evaluation addressing the December 2010 storm event, Glick opined that the "primary causes" of the storage facility's inundation were "a direct result of" failures that had nothing to do with University's gutter drainage, sheet flow, sandbagging or inlets on University's property.[9]

Focusing on whether the evidence demonstrates University's inaction was unreasonable, we conclude as a matter of law it does not. We look to University's purpose or motives in using its property, as well as the amount and foreseeability of harm caused. (*Keys*, *supra*, 64 Cal.2d at p. 410; *Contra Costa*, *supra*, 235 Cal.App.4th at p. 934.) We also look at the "amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed." (*Locklin*, *supra*, 7 Cal.4th at p. 337.) Under *Keys*, University incurs no liability when, objectively viewed, the utility of University's use of its land outweighs the gravity of harm caused by the use. (*Keys*, *supra*, 64 Cal.2d at p. 410; *Contra Costa*, at

[9]     Glick's report opines that the "primary causes of the inundation of [SoCal's] property are a direct result of" (1) *City's* inadequate reservoir operational planning and maintenance; (2) *City's* failure to maintain runoff control structures; (3) clogging of storm drain inlets along Mountain View Avenue due to runoff from the watershed; (4) widening of Mountain View Avenue that altered and restricted stormwater flow without adequate catch basins; (5) alteration of the stormwater runoff pattern from the Loma Linda plaza due to installation of a curb along the access road constructed to accommodate the widening of Mountain View Avenue, and (6) clogging of the storm drain inlet installed along the access road between Mountain View Avenue and the project site and slope failure on the Mountain View Avenue fill embankment. In reply, SoCal points to the fifth cause, claiming that Glick was referring to the flow over University's parking lot. Even if that were the case, Glick stated that the alteration of the runoff in that area was "by installation of a curb along the access road constructed to accommodate the widening of Mountain View Avenue and construction of the extended roadway fill embankment." Glick thus attributed the runoff alteration to City's curb and embankment, not to University's gutters, inadequate inlets or sheet flow off its buildings.

p. 934.)

SoCal presented no evidence that University had any improper motive or purpose in passively using or maintaining its parking areas and buildings, or that it had any other purpose for its gutter system than the standard drainage of rainwater from its buildings. There is no evidence University intended to direct surface or floodwater onto SoCal's property. Nor can SoCal show foreseeability of the resulting harm as a component of the reasonableness inquiry. (*Keys*, *supra*, 64 Cal.2d at p. 410; *Contra Costa*, *supra*, 235 Cal.App.4th at p. 932.) It is undisputed that since University's acquisition of its property, it had never been inundated by water, mud, rocks and/or debris. SoCal presented evidence that the weather service gave several days notice of the possibility of flooding, but there is no evidence that University knew or should have known the water flow through roof drains and parking lot or via its gutter system would discharge an unreasonably severe amount of water into SoCal's property. Geiler's statement that University "would not fix" its overflowing gutters, and that a residence on SoCal's property suffered seepage in heavy rains, does not permit a reasonable inference that University was aware of a drainage problem on SoCal's property or its extent. Unlike *Contra Costa*, *supra*, 235 Cal.App.4th 914, in which the landowner was warned multiple times that failure to maintain an existing drainage channel on its property would result in flooding to the adjoining residences, there is no evidence here University knew its inaction with respect to the existing gutters or inlets on its property would contribute with the heavy flooding to cause the significant damage that occurred in December 2010. Indeed, SoCal's own evidence demonstrates the absence of any prior known water

27

discharge problems, when Geiler states:  "Prior to December 22, 2010, in the 26 years that [SoCal] had owned the Facility, it had never experienced any significant issues with surface water discharge, much less any flooding.  Plaintiff is unaware of the Facility experiencing any significant issues with surface water discharge or flooding prior to its ownership of the Facility."  Notably, Glick pointed out in her hydrologic assessment that prior, more significant, storm events did not result in flooding in the vicinity or at SoCal's property:  "The December 16-22, 2010, storm event, which resulted in significant flooding and sediment deposition at the project site and the surrounding areas in Loma Linda, California produced significantly less rain than storm events which occurred in the 2006-2007 rain season, which did not generate flooding at or in the vicinity of the project site."  Thus, the extensive damage to SoCal's property from the basin overflowing and flooding was not foreseeable as to render University's omissions unreasonable.

Further, notwithstanding *Keys*'s rejection of strict negligence accountability, there must nevertheless be a causal relationship between a diverting landowner's conduct and alleged harm to an adjoining landowner.  (*Keys*, *supra*, 64 Cal.2d at p. 410 [the amount of harm *caused* by the upper owner is one of the reasonableness factors]; see also *Locklin*, *supra*, 7 Cal.4th at pp. 359-360.)  Here, it is undisputed that days of heavy rain in December 2010 caused an overflow of the Scott basin, which resulted in a torrent of water, mud, dirt and debris down Mountain View Avenue into the shopping center parking lot.  That onslaught—combined with City's widening of Mountain View Avenue as well as slope, drainage, and other failures that were not attributable to University— were the *primary causes* of the inundation of SoCal's property, failure of SoCal's

28

masonry wall, and significant damage. Though Glick presented some evidence that sandbagging by University would have reduced SoCal's damage, her official and studied conclusion as to the primary causes of the inundation of SoCal's property had nothing to do with University's gutter drainage, sheet flow, sandbagging or inlets on University's property. Glick's testimony shows that other failures caused by the December 2010 storm were intervening and primary causes of the significant harm suffered by SoCal.

This evidence compels a conclusion that SoCal has not demonstrated triable issues of material fact as to University's role in causing its harm, which as we have indicated, is a matter that may be decided as a question of law if the facts leave no room for a reasonable difference of opinion. (*Ambriz v. Kelegian*, *supra*, 146 Cal.App.4th at pp. 1531-1532.) " '[A] cause in fact is something that is a substantial factor in bringing about the injury.' " (*South Coast Framing, Inc. v. W.C.A.B.* (2015) 61 Cal.4th 291, 298.)

Given that the primary causes of SoCal's damages were unrelated to University, we would conclude under these circumstances, that on balance, the utility of University's uses in draining surface and floodwaters off its property precludes liability as a matter of law. The question of reasonableness is a factual inquiry (*Keys*, *supra*, 64 Cal.2d at p. 410; *Contra Costa*, *supra*, 235 Cal.App.4th at p. 932), but on this evidence, a reasonable fact finder can only come to one conclusion. Summary judgment was properly granted on SoCal's tort causes of action for negligence and nuisance.

IV. *Trespass*

" ' "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." ' " (*Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244, 1252.) It does not require a personal entry onto the property but " 'may be accomplished by the casting of substances or objects upon the plaintiff's property from without its boundaries.' " (*Elton v. Anheuser–Busch Beverage Group, Inc.* (1996) 50 Cal.App.4th 1301, 1306.) But "liability for trespass will not be imposed unless the trespass was intentional, the result of recklessness, negligence, or the result of an extra hazardous activity." (*Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229, 233; see also *Armitage v. Decker* (1990) 218 Cal.App.3d 887, 906.) We have already held summary judgment was properly granted on SoCal's negligence claim, eliminating that theory of trespass. Intentional conduct, for purposes of a trespass, may include not only the result the actor desires, but also the consequences that he knows are substantially certain to result. (*Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1408; see also *Roberts v. Permanente Corp.* (1961) 188 Cal.App.2d 526, 530 [the "doing of an act which will to a substantial certainty result in the entry of foreign matter upon another's land suffices for an intentional trespass to land upon which liability may be based"].)

SoCal argues the court erred by granting summary judgment on its trespass cause of action, asserting there was undisputed evidence that both Clark and University "intentionally diverted water into SoCal's property without permission and damaged it." However, the sole record citation in support of this assertion is SoCal's points and authorities in opposition to the summary judgment motions, in which it merely argued

30

that Clark and University "for years have used their building to block the area's natural drainage and have used their outlets and their parking area to discharge their waters and the waters they receive from [other property owners] into the Facility." Of course, " '[e]vidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) It is well settled that "[s]tatements and arguments by counsel are not evidence." (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 139.) Thus, we do not consider these statements when evaluating SoCal's claim. As a result, SoCal has not met its appellate burden to demonstrate error.

A summary judgment is presumed to be correct, and even when review is de novo, the appellant still bears the burden of affirmatively demonstrating error. (See *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 252.) Thus, it is SoCal's responsibility to point out the claimed triable issues by specific citation to the factual record and supporting legal authority. This court is not " 'obligate[d] . . . to cull the record for the benefit of the appellant.' " (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.) When an appellant asserts a point but fails to support it with reasoned argument and appropriate legal and factual citations, we treat the point as forfeited. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066; see also *People v. Stanley* (1995) 10 Cal.4th 764, 793.) That is the case here, but we observe in any event based on our analysis above that there is no evidence by which a reasonable jury could conclude that Clark or University either sought to divert water onto SoCal's property, or created a condition that they knew to a substantial certainty would result in a damaging

31

diversion of water onto SoCal's property.  We conclude SoCal has not shown its evidence raised triable issues of material fact as to trespass.

## V.  *Conversion*

"Conversion is the wrongful exercise of dominion over the personal property of another."  (*Taylor v. Forte Hotels International* (1991) 235 Cal.App.3d 1119, 1124.) " ' " 'The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages . . . .' " ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240; see also Black's Law Dict. (6th Ed.1990) p. 332, col. 1 [conversion is an "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights"].)

Conversion is a strict liability tort in that wrongful intent is not necessary:  " ' "The foundation for the action for conversion rests neither in the knowledge nor the intent of the defendant. . . .  [Instead,] 'the tort consists in the breach of what may be called an absolute duty; the act itself . . . is unlawful and redressible as a tort.' " ' " (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 144 & fn. 38; *Taylor v. Forte Hotels International*, *supra*, 235 Cal.App.3d at p. 1124; see also *Regent Alliance Ltd. v. Rabizadeh* (2014) 231 Cal.App.4th 1177, 1181.)  " 'Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial.' " (*Regent Alliance Ltd.*, at p. 1181.)  This court has held that while the tort does not require wrongful intent, "the *act* must be knowingly or intentionally done . . . ." (*Taylor v. Forte*

32

*Hotels International*, at p. 1124, citing *Poggi v. Scott* (1914) 167 Cal. 372, 375; see also

*Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 812-815 [conversion

cannot occur "accidentally"].)

SoCal's appellate arguments on these points suffer from the same flaws as its

arguments on trespass: they are based only on citations to arguments made in its opposing

points and authorities.  Thus, SoCal has not demonstrated with reasoned legal argument

or competent evidence that summary judgment was precluded on its conversion claim.

And, on this record, evidence supporting essential elements of SoCal's conversion

claim—Clark or University's *wrongful* act or disposition of SoCal's personal property, as

well as any act on their part *knowingly* or *intentionally* done—is absent.

DISPOSITION

The judgments are affirmed.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.